**RAINTREE FRIENDS HOUSING, INC. and Jamestown Friends Housing, Inc., Petitioners,**

v.

**INDIANA DEPARTMENT OF STATE REVENUE, Respondent.**

Nos. 49T10–9404–TA–00224, 49T10–9409–TA–00225.

Tax Court of Indiana.

July 16, 1996.

Robert L. Trierweiler, Jensen & Trierweiler, Indianapolis, for petitioners.

Pamela Carter, Attorney General of Indiana, Marilyn S. Meighen, Deputy Attorney General, Indianapolis, for respondent.

FISHER, Judge.

Raintree Friends Housing, Inc. and Jamestown Friends Housing, Inc. (collectively the Housing Corporations) each appeal final determinations of the Indiana Department of State Revenue (the Department) assessing them with gross income tax, sales tax, and food and beverage tax for the periods ending December 31, 1989, June 30, 1990, December 31, 1990, June 30, 1991, December 31, 1991, June 30, 1992, and December 31, 1992 (the periods at issue). The appeals of Raintree Friends Housing, Inc. and Jamestown Friends Housing, Inc. are considered together because they raise the same issues.

## ISSUE

Several issues were brought to the Court for review, yet one issue is dispositive. Therefore, the only question addressed by this Court is whether the Housing Corporations are organized and operated exclusively for charitable purposes and are thus exempt from Indiana's gross income tax, sales tax, and food and beverage tax.

## FACTS

Raintree Friends Housing, Inc. is an Indiana not-for-profit corporation. It owns and operates a retirement home for the aged in New Castle, Indiana called Raintree Square. Jamestown Friends Housing, Inc. is an Ohio not-for-profit corporation authorized to do business in Indiana. It owns and operates two retirement homes for the aged in Indiana: 1) Home Place in Indianapolis, and 2) Sanders Glen in Westfield. Both Housing Corporations were founded by the Wilmington Friends Meeting, a Quaker Church located in Wilmington, Ohio. The Housing Corporations are managed by Quality Quaker Management, Inc., also based in Wilmington, Ohio.

Raintree Square, Home Place, and Sanders Glen (collectively the Retirement Homes) are "assisted living" or "congregate support" communities which help aged persons live independent lives. They cater to aged persons, and do not accept individuals younger than age 55.[1] In addition to providing the amenities found in traditional apartment living,[2] the Retirement Homes offer many unique and special services to their residents.

Specifically, each apartment is equipped with hallway and bathroom grab bars, as well as emergency pull cords and smoke detectors which alert the 24 hour support services office. Some of the apartments are specially designed to accommodate persons in wheel chairs. On-site cafeterias serve three meals each day seven days a week.[3] Qualified nurses aids or L.P.N.s are on staff to assist residents with their medications and provide other minor medical testing and assistance. An activities director plans on and off site social functions, takes residents on errands, and arranges for clergy from the community to come in and conduct Sunday worship services. A variety of pay-for-use services are specially provided for residents who need assistance with tasks such as bathing, doing laundry, housekeeping, scheduling and attending doctor's visits, and running errands.

Before admitting residents, the Retirement Homes require that prospective residents provide proof that they are financially able to meet the monthly rental payments[4] and able to live independently or provide their own care givers. Prospective residents who do not meet these requirements are denied admittance. However, if a resident

has difficulty paying his or her monthly rent, the Retirement Home works with that resident to find additional resources or reduces specific costs so that the resident can continue to live in the facility. Furthermore, if a resident is no longer ambulatory or mentally alert, the Retirement Home will assist the resident in obtaining private duty care or moving to a nursing home or other facility designed to meet his or her needs.

While the Retirement Homes receive donated support and services of a non-financial nature from local Quaker Church congregations, they are funded almost exclusively by tenant rent and fees. In an effort to avoid one resident subsidizing another, the Retirement Homes do not charge residents different rates, but request that each resident pay the full cost of his or her living expenses. The rent charged represents the actual cost of the services provided to the residents, and residents only pay for the services they use. The Retirement Homes receive no profit from the services they provide. Additional facts will be supplied as necessary.

### PROCEDURAL HISTORY

The Housing Corporations applied for and received recognition as not-for-profit, tax exempt charitable organizations under section 501(c)(3) of the Internal Revenue Code. Accordingly, the Housing Corporations did not owe federal income tax for the periods at issue.

The Housing Corporations also received not-for-profit status from the Department for

---

1. The spouses of persons age 55 or older are eligible to live in the Retirement Homes, even if they themselves are not yet age 55. Most residents are between the ages of 75 and 85.

2. Each resident signs a rental contract and pays a refundable security deposit prior to occupancy. Rent is due on a monthly basis and 30 days' written notice must be given before vacating. Each resident has exclusive possession and use of his or her own apartment, which includes a private kitchen, bath, water heater, heater, air conditioner, smoke detectors, a washer/dryer hook-up or access to an on-site laundry facility, and cable television service. Maintenance of the apartments and grounds is provided. At least one of the Retirement Homes has an on-site exercise facility.

3. Residents are required to eat at least one meal per day in the cafeteria. If a resident does not partake of one meal per day, a staff member will check on that resident.

4. In 1995, the rent at Raintree ranged from $800.00 to $1,150.00 per month, the rent at Sanders Glen $760.00 to $1,035.00 per month, and at Home Place $450.00 to $700.00 per month. These rental fees include the cost of utilities, trash collection, housekeeping and maintenance of common areas, van service and bus passes, and telephone and cable television service. At Raintree and Sanders Glen, the rental fee also includes 24 hour staff service and one meal per day.

the periods at issue based upon the IRS 501(c)(3) ruling. After conducting an audit, however, the Department determined that the Housing Corporations did not qualify for tax exempt status in Indiana. On February 28, 1994, the Department held an administrative hearing with a second hearing on March 16, 1994. The Department issued letters of finding on March 29, 1994. The Housing Corporations requested a rehearing on April 28, 1994, which the Department denied on May 2, 1994. The Housing Corporations filed this original tax appeal on September 26, 1994. This Court held trial on September 11, 1995 and heard oral arguments on March 14, 1996.

### STANDARD OF REVIEW

■ This court reviews appeals from the Department *de novo*. *Mechanics Laundry & Supply, Inc. v. Indiana Dep't of State Revenue*, 650 N.E.2d 1223, 1227 (Ind.Tax 1995). "It is bound by neither the issues nor the evidence presented at the administrative level." *Id.*

■ It is a general rule that tax exemption statutes are strictly construed against the taxpayer and in favor of the State. *Indiana Waste Systems of Indiana v. Indiana Dep't of State Revenue*, 633 N.E.2d 359, 365 (Ind.Tax 1994). The Court, however, must give effect to the intent of the legislature, and must not construe an exemption so narrowly that its proper application is defeated. *Id.*

### DISCUSSION & ANALYSIS

■ The Indiana Constitution authorizes the taxation of income "from whatever source derived, at such rate, in such manner, and with such exemptions as may be prescribed by law." IND. CONST. art. X, § 8. Consequently, Indiana imposes a gross income tax on: "(1) the entire taxable gross income of a taxpayer who is a resident or a domiciliary of Indiana; and (2) the taxable gross income derived from activities or businesses or any other sources within Indiana by a taxpayer who is not a resident or a domiciliary of Indiana." IND. CODE 6–2.1–2–2. Under IND. CODE 6–2.1–3–20, however, a not-for-profit corporation "that is *organized and op-*

*erated exclusively for ... charitable ... purposes* is exempt from gross income tax if no part of the gross income is used for the private benefit or gain of any member, trustee, shareholder, employee or associate of the taxpayer." (Emphasis added).

In the case at bar, the Housing Corporations' not-for-profit status is not disputed nor is it disputed that the Housing Corporations do not use gross income for private benefit or gain. What is disputed, however, is that the Housing Corporations are operated exclusively for charitable purposes.

The Housing Corporations argue that the care they provide for the aged benefits society by relieving a burden society would otherwise shoulder. Such a charitable purpose, they contend, relieves them of tax liability.

The Department, on the other hand, argues that while the Housing Corporations provide services which are worthwhile and beneficial, the income they receive from the operation of those services is unrelated business income, and therefore taxable. In other words, the Department argues that the Housing Corporations are not operating for a charitable purpose because the services they offer are no different than those offered by traditional apartment complexes. Therefore, the Court must determine whether the Housing Corporations are organized and operated exclusively for charitable purposes.

■ While the Retirement Homes are not-for-profit corporations, such status does not automatically qualify them as charitable organizations. *See Lincoln Hills Development Corp. v. State Bd. of Tax Comm'rs*, 521 N.E.2d 1360, 1361 (Ind.Tax 1988). Their charitable purpose must be proven before tax exempt status is assured. *See id.* For purposes of the Indiana gross income tax, there is no codified definition of "charitable." Consequently, the Court will look to the plain, ordinary, and usual meaning of "charitable" and how courts have construed the term. *See* IND. CODE 1–1–4–1(1); *see also Mechanics Laundry*, 650 N.E.2d at 1228.

Charity is broadly defined as:

a gift for, or institution engaged in, public benevolent purposes. [It is a]n attempt in

good faith, spiritually, physically, intellectually, socially and economically to advance and benefit mankind in general, or those in need of advancement and benefit in particular, without regard to their ability to supply that need from other sources and without hope or expectation, if not with positive abnegation, of gain or profit by donor or by instrumentality of charity.

*Black's Law Dictionary* 213 (5th ed.1979). Likewise, Indiana courts have broadly construed the term "charitable." In 1865, the Indiana Supreme Court held that Grand Master was a charitable organization, even though it confined its benefits to members of the Masonic order who paid admission fees. *City of Indianapolis v. The Grand Master, etc., of the Grand Lodge of Indiana,* 25 Ind. 518 (1865). The Supreme Court explained:

> It is not essential to charity that it shall be universal. That an institution limits the dispensation of its blessings to one sex, or to the inhabitants of a particular city or district, or to the membership of a particular religious or secular organization, does not ... deprive it either in legal or popular apprehension of the character of a charitable institution. If that only be charity which relieves human want, without discrimination amongst those who need relief, then indeed it is a rarer virtue than has been supposed. And if one organization may confine itself to a sex, or church, or city, why not to a given confraternity? So narrow a definition of charity ... is not ... ever attached to it ...

*Id.* at 522–23.

In applying the Supreme Court's broad construction of charity, the Indiana Court of Appeals held that a retirement home for the aged was exempt from property tax. *State Bd. of Tax Comm'rs v. Methodist Home for Aged,* 143 Ind.App. 419, 429, 241 N.E.2d 84, 90 (1968). In this case, the court quoted with approval the following language:

> Institutions of this nature are generally held to be exempt from taxation as being used for charitable purpose, and it has been held that the fact that fees are charged for the use of the privileges of the institution does not itself decide that the institution is not charitable when it does

not appear that the fees are more than sufficient to pay the expenses of maintenance or that the proprietors of the institution derive any profit therefrom.

*Id.* at 426, 241 N.E.2d at 88–89 (quoting 1921–23 Op. Att'y Gen. 438 (1921)). However, in a later case, the Indiana Court of Appeals concluded that institutions that predominately provide social and recreational activities are not charitable, for they fail to relieve human want and suffering in a manner "different from the everyday purposes and activities of man in general." *Indianapolis Elks Bldg. Corp. v. State Bd. of Tax Comm'rs,* 145 Ind.App. 522, 540, 251 N.E.2d 673, 683 (1969).

While these broad interpretations of the term "charitable" have been used in the context of property taxation, they will not be cast aside today merely because gross income tax is at issue. *See Kimco Leasing v. State Bd. of Tax Comm'rs,* 656 N.E.2d 1208, 1214 n. 9 (Ind.Tax 1995) (when a statutory word is not defined in the act of which it is a part, the court may look to other acts to see how the word is defined). Thus, the Court finds the above cited cases persuasive in defining charitable purpose in the context of gross income tax.

Furthermore, public policy supports a broad interpretation of charity. The historical purpose of providing charitable organizations with tax exemptions is to reward organizations which provide a benefit to citizens through the services they offer. *See State Bd. of Tax Comm'rs v. Wright,* 139 Ind.App. 370, 374–75, 215 N.E.2d 57, 60 (1966); *see also Bob Jones Univ. v. United States,* 461 U.S. 574, 587–92, 103 S.Ct. 2017, 2026–29, 76 L.Ed.2d 157, 171–74 (1983). Caring for the aged is a recognized benefit to the community at large and society as a whole. *Wilson v. Dexter,* 135 Ind.App. 247, 256, 192 N.E.2d 469, 474 (1963). Indiana law recognizes that:

> the aged require care and attention entirely independent of financial needs, and that present day humanitarian principles demand that those in their declining years have the opportunity to live with as much independence as their strength will permit, in as pleasant and happy surroundings as their finances will reasonably justify.

*Methodist Home,* 143 Ind.App. at 428, 241 N.E.2d at 89. Thus, by meeting the needs of the aging, namely: "relief of loneliness, boredom, decent housing that has safety and convenience and is adapted to their age, security, well-being, emotional stability, [and] attention to problems of health," a charitable purpose is accomplished. *Id.* at 422, 241 N.E.2d at 86.

The Housing Corporations provide beneficial and worthwhile services to the aged population. Indeed, the mission statement of each Retirement Home articulates that its goal is to assist residents in living as independently as possible for as long as possible. The Retirement Homes provide a benefit to society by catering to the specific needs of their aged residents and by providing community, security, and assisted living for those in need.

The Housing Corporations provide benefits beyond mere shelter, food, and assistance to the aged. The Retirement Homes enable residents to stay within their communities and among family and friends. Social functions are organized and promoted by an activities director that include participation from senior citizens within the community. The cafeteria and community room are open for social activities and gatherings any time during the day. The Retirement Homes extend themselves to the community by hosting conferences on aging, hosting AARP board meetings, and inviting school groups and community organizations to visit the Retirement Homes and provide entertainment for the residents.

The Housing Corporations also provide special amenities for their residents that suit the needs of aged persons. Specifically, each housing unit is equipped with bathroom and hallway grab bars as well as emergency pull cords and smoke detectors which alert the staff 24 hours a day. A security guard patrols the halls at night which provides the residents with added security and safety. Residents must attend one meal per day in the dining facility which enables the staff to monitor residents and provides residents with an opportunity for social interaction.[5] Meals are tailored to the dietary and health needs of aged persons.

The Housing Corporations further provide supportive services to the residents that enable them to live more independently for a longer period of time. These services include wake up calls and assistance in dressing, bathing, taking medication, making doctor appointments, laundering and cleaning their residence. Some of these services are incorporated in the resident's monthly fee, whereas some services require additional fees. The convenience of having the services available, as well as having only one cumulative monthly bill, reduces residents' anxiety level and enables residents to tend to their own needs longer in life. Indeed, one of the goals of the Retirement Homes is to enable residents to function at active levels, preventing the need for nursing home care.

The amenities and services provided to residents are equally as beneficial to them and society at large as providing financial assistance which is the traditional notion of charity. The fact that the Retirement Homes charge a fee for the services they provide is not a bar to their charitable status, as charities often need to charge reasonable and sufficient fees to cover the cost of their operation. *See Methodist Home,* 143 Ind. App. at 425, 241 N.E.2d at 88. Nevertheless, the Retirement Homes have made financial adjustments in order to assist or accommodate a resident who could not afford the price as stated. Even though eviction for nonpayment is mentioned in the lease agreements, no resident has ever been evicted due to their inability to pay.[6]

Even though the Retirement Homes limit residents to those capable of paying the monthly fees, charitable organizations may limit the persons to whom they provide services without jeopardizing their charitable

5. The Housing Corporations emphasize the importance to aged persons of getting dressed and out of their homes once a day both for their mental health and for maintaining their independent living.

6. No one has ever been evicted from Sander's Glen or Raintree. One individual was evicted at Home Place who had the financial resources to pay for the services but refused to so do.

tax exempt status. *Methodist Home*, 143 Ind.App. at 425, 241 N.E.2d at 88. "The fact that an organization's benefits are limited to a particular group or a limited number of people does not mean that the organization cannot be regarded as exclusively charitable...." *In Re Estate of Albersmeier*, 425 N.E.2d 245, 246 (Ind.App.1981). Consequently, the Housing Corporations provide assisted living for persons who typically have a small retirement plus social security funds which disqualifies them for government assistance, yet does not enable them to afford the services they need if purchased within the community. Even though senior citizens without sufficient financial means do not enjoy the direct benefits of residing in the Retirement Homes, such a limitation is permissible under Indiana's broad interpretation of charitable. *See id.*

Finally, the charitable purpose of the Housing Corporations is also supported by its affiliation with the Society of Friends. The Housing Corporations were founded by the Wilmington Friends Meeting and are managed by Quality Quaker Management. The Board of Directors and the Trustees of the Housing Corporations are primarily members of the Quaker Church. While no direct financial support is given to the Retirement Homes by the Quaker Church, Quaker Meeting members volunteer and donate resources to the Retirement Homes in each of the three communities. Home Place was actually built next to the West Newton Friends Meetinghouse.[7] This continuous involvement and influence exercised by the Quakers buttresses the charitable purpose and intent of the Housing Corporation.

■ Upon the facts of this case, the Court finds that the Housing Corporations are or-

ganized and operated exclusively for charitable purposes, and thus are exempt from the gross income tax under I.C. 6–2.1–3–20(a).[8] The Department, however, asserts that despite this finding, the Housing Corporations are subject to gross income tax on unrelated trade or business income as defined in Section 513 of the Internal Revenue Code. *See* IND. CODE 6–2.1–3–23.

Section 513 of the Internal Revenue Code concerns income received by an exempt organization which is not substantially related to the exercise of its charitable purpose or function constituting the basis for its exemption. 26 U.S.C.A. § 513 (1988). The Department basically alleges that all of the gross income received by the Housing Corporations is unrelated business income. The Court finds that the evidence presented shows that the Housing Corporations' gross income is, in fact, directly related to the charitable purposes for which they are organized and operating. Thus, Section 513 does not apply and the Housing Corporations are not subject to unrelated trade or business income tax pursuant to I.C. 6–2.1–3–23.

■ Although the Department does not address such in its brief, the Housing Corporations were apparently assessed adjusted gross income tax under IND. CODE 6–3–2–2.8. *Exhibit* 33 & 36. Since the Housing Corporations are organizations described by IRC section 501(c)(3) and such status has not been revoked or changed, they are entitled to an exemption under IRC section 501(a), which, in turn, entitles them to an exemption from the adjusted gross income tax under I.C. 6–3–2–2.8.[9]

■ In as much as the Housing Corporations are exempt from gross income tax under I.C. 6–2.1–3–20(a), their sales of food

7. There is a walkway between the two buildings and the common room and dining room of Home Place are often used by the church for functions and meetings.

8. The Department argues that the federal guidelines adopted by the IRS to determine whether an organization qualifies for tax exemption under 501(c)(3) is the appropriate test in Indiana to determine whether an organization is charitable for state tax purposes. This Court finds no precedent in Indiana for adopting the IRS guidelines in this context. Moreover, the Department concedes that neither the Indiana legislature nor

its courts have adopted the federal guidelines for determining an organizations' charitable status in Indiana. *Transcript of March 1996 Hearing* at 32–33. Therefore, the Court declines the Department's invitation to adopt the IRS guidelines, which adoption should properly be by statute or regulation.

9. "Notwithstanding any provision of IC 6–3–1 through 6–3–7, there shall be no tax on the adjusted gross income of the following: (1) Any organization described in Section 501(a) of the Internal Revenue Code...." I.C. 6–3–2–2.8.

are also exempt from gross retail tax under IND. CODE 6-2.5-5-25 [10] and IND. CODE 6-2.5-5-26(b) [11]. Furthermore, by virtue of being exempt from the gross retail tax, Home Place is exempt from the Marion County food and beverage tax under IND. CODE 6-9-12-4.[12] Likewise, Raintree is exempt from the Henry County food and beverage tax by virtue of being exempt from the gross retail tax.[13] IND. CODE 6-9-25-4(c).

### *CONCLUSION*

The Housing Corporations are organized and operated exclusively for charitable purposes, and thus are exempt from gross income tax, sales tax, and food and beverage tax. Therefore, the Court REVERSES the Department's final determination.

10. "Transactions involving tangible personal property or service are exempt from the state gross retail tax, if the person acquiring the property or service: (1) is an organization which is granted a gross income tax exemption under IC 6-2.1-3-20 ...; (2) primarily uses the property or service to carry on or to raise money to carry on the not-for-profit purpose for which it receives the gross income tax exemption; and (3) is not an organization operated predominantly for social purposes." I.C. 6-2.5-5-25.

11. "Sales of tangible personal property are exempt from the state gross retail tax, if: (1) the seller is an organization which is granted a gross income tax exemption under ... IC 6-2.1-3-20 ...; (2) the seller is not operated predominantly for social purposes; (3) the property sold is designed and intended primarily either for the organization's educational, cultural, or religious purposes, or for improvement of the work skills or professional qualifications of the organization's members; and (4) the property sold is not designed or intended primarily for use in carrying on a private or proprietary business." I.C. 6-2.5-5-26(b).

12. "The [Marion] county food and beverage tax *does not apply to the furnishing, preparing, or serving of any food or beverage in a transaction that is exempt ... from the state gross retail tax imposed by IC 6-2.5.*" I.C. 6-9-12-4.

13. "The [Henry] county food and beverage tax does not apply to the furnishing, preparing, or serving of any food or beverage in a transaction that is exempt ... from the state gross retail tax imposed by IC 6-2.5." I.C. 6-9-25-4(c). Hamilton County has no food and beverage tax, and thus this is not an issue for Sanders Glen.