**STATE BOARD OF TAX COM-
MISSIONERS, Appellant
(Respondent Below),**

v.

**Juan C. GARCIA and Maria N. Garcia,
Appellees (Petitioners Below).**

No. 71S10–0108–TA–366.

Supreme Court of Indiana.

April 12, 2002.

Steve Carter, Attorney General of Indiana, Nandita G. Shepherd, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

Timothy D. Hernly, John C. Smarrella, Barnes & Thornburg, South Bend, IN, Attorneys for Appellees.

SHEPARD, Chief Justice.

In a property grading system based upon comparables, what happens when a property is incomparable?

In this case, the Indiana State Board of Tax Commissioners appeals the Indiana Tax Court's decision that the Board's methodology for assessing Juan and Maria Garcia's home at a grade of "A + 6" for the 1993 tax year was arbitrary and capricious. The State Board argues that the Tax Court abused its discretion in overturning the grading.

We conclude that the Tax Court did not give adequate deference to the Board's method of calculation and thus affirm the grade of "A + 6" for the Garcias' residence.

**Facts and Procedural History**

The Garcias' home was assessed as of March 1, 1993. The resulting proceeding has involved two local assessments, two hearings before the State Board, two published opinions from the Tax Court, and now our decision. *Garcia v. State Bd. of Tax Comm'rs*, 694 N.E.2d 794 (Ind.Tax 1998) ("*Garcia I*"), *appeal after remand*, 743 N.E.2d 817 (Ind.Tax 2001) ("*Garcia II*"), *review granted*, 761 N.E.2d 415 (Ind. 2001).

The Garcias reside in an 11,000 square foot dwelling in South Bend. The Penn Township Assessor originally assigned a grade of "A + 10," the highest grade assignable. 50 Ind. Admin. Code 2.1-3-2(b), 4(f) (1992). Displeased with this grade, the Garcias petitioned the St. Joseph County Board of Review. In February 1994, the County Board determined that the Garcias' home was properly assessed.

The Garcias then filed a Form 131 Petition for Review of Assessment with the State Board in March 1994, and the Board held a hearing on July 14, 1994. The Board heard evidence regarding the exterior of the residence, the structural elements of the roof, and the high quality amenities such as cabinets, light fixtures, plumbing fixtures, and multiple heating systems, features that were all generally indicative of an "A" grade dwelling. 50 IAC 2.1-3-2 (1992). The State Board agreed that the Garcias' home deserved an elevated "A" grade, but reduced the assessment to "A + 4."

The Garcias next filed an original tax appeal petition with the Tax Court, which held the Board's methodology in grading dwellings above an "A" grade was arbitrary and capricious. *Garcia I*, 694 N.E.2d at 795. The Tax Court remanded to the Board for further consideration. *Id.* at 800.

Following the Tax Court's decision, the State Board held a remand hearing on June 22, 1998. Using a methodology discussed in detail below, the Board revised the grade of the Garcias' dwelling to "A + 6."

After this setback, the Garcias filed a second original tax appeal petition to the Tax Court. The Tax Court again held that "neither the regulations nor generally accepted appraisal standards provide for setting a grade above an 'A,'" and it directed the State Board to enter a grade of "A" on the Garcias' home for 1993. *Garcia II*, 743 N.E.2d at 821.

The Board petitioned this Court to review the final judgment of the Tax Court pursuant to Indiana Appellate Rule 63. We granted review. 761 N.E.2d 415.

**What Lies Ahead**

This case arrives here as major developments in Indiana property assessment law

are underway. Reassessment of all property in Indiana is currently taking place for the March 1, 2002 lien date, producing new assessments that will be reflected in tax bills in 2003. In response to our holding in *State Board of Tax Commissioners v. Town of St. John*, 702 N.E.2d 1034 (Ind.1998), and to satisfy the statutory and constitutional requirements of property tax assessments, the State Board has developed a new manual and guidelines. *See* 50 IAC 2.3–1–1 (2001).

■ At the heart of the new regulations is the State Board's endeavor to define "true tax value" so as to measure property wealth.[1] True tax value is defined as "[t]he market value-in-use of a property for its current use, as reflected by the utility received by the owner or a similar user, from the property, less that portion of use value representing subsistence housing for its owner." State Board of Tax Commissioners, 2002 Real Property Assessment Manual 2 (2001).

The manual further explains true tax value as "the ask price of property by the owner, because ... the ask price represents how much utility must be replaced to induce the owner to abandon the property." *Id.* Attempting to measure "value-in-use" as opposed to "value-in-exchange," the manual specifies three methods for determining the value of real property: (1) cost approach,[2] (2) sales comparison approach,[3] and (3) income approach.[4] *Id.* Using one of these methods, the manual states that assessors will arrive at the true tax value, reduced by the applicable shelter allowance for owner-occupied housing units. *Id.* at 3, 7, 23.

The manual goes on to say:

Appeal of assessments must operate within the rules and utilize data in the same manner as provided in this manual. In general, this requires that challenges to assessments be proven with aggregate data, rather than individual evidence of property wealth. Since assessments are calculated using aggregate data, it is not permissible to use individual data without first establishing its comparability or lack thereof to the aggregate data. By requiring taxpayers to make any internal data "readily available" assessors are given the opportunity to establish this comparability.

There shall be a presumption that the value determined according to the rules prescribed in this manual is the true tax value of the subject property. However, the taxpayer shall be permitted to offer evidence relevant to the fair market value-in-use of the property to rebut such

---

1. The Indiana Constitution requires "a system of assessment and taxation characterized by uniformity, equality and just valuation based on property wealth, but the Clause does not require absolute and precise exactitude as to the uniformity and equality of each individual assessment." *Town of St. John*, 702 N.E.2d at 1040 (discussing Ind. Const. art. X, § 1). Indiana Code Ann. § 6–1.1–31–6(c) (West 2001) states that "[w]ith respect to the assessment of real property, true tax value does not mean fair market value."

2. The "cost approach" attempts to "estimate[ ] the value of the land as if vacant and then add[ ] the depreciated cost new of the improvements to arrive at a total estimate of value." *Id.* at 3.

3. The "sales comparison approach" purports to "estimate[ ] the total value of the property directly by comparing it to similar, or comparable, properties that have sold in the market." *Id.*

4. The "income approach," typically used for income producing properties, attempts to convert an estimate of what the property is expected to produce "into a value through a mathematical process know as capitalization." *Id.*

presumption and to establish the actual true tax value of the property as long as such information is consistent with the definition of true tax value provided in this manual and was readily available to the assessor at the time the assignment was made. Such evidence may include actual construction costs, sales information regarding the subject or comparable properties, appraisals that are relevant to the market value-in-use of the property, and any other information compiled in accordance with generally accepted appraisal principles.

*Id.* at 5–6.

The State's declared goal is to establish a more objectively verifiable result that will satisfy the constitutional requirements of uniform and equal property assessment. *See id.* at 2–3.

Tax Board and Tax Court practice are likewise changing. Effective January 1, 2002, the State Board of Tax Commissioners was abolished and its duties distributed to two new agencies: the Department of Local Government Finance, which has tax collection authority,[5] and the Indiana Board of Tax Review, which will review property tax appeals.[6]

As for the Tax Court, the legislature has abolished the Tax Court's former practice of re-creating the evidence that had been before the State Board as a substitute for making a formal administrative record at the time of the Board proceedings.[7] Instead, the Board of Tax Review must now

prepare a certified record of the proceedings related to the petition for judicial review that includes:

(1) Copies of all papers submitted to the Indiana board during the course of the action and copies of all papers provided to the parties by the Indiana board. For purposes of this subdivision, the term "papers" includes, without limitation, all notices, petitions, motions, pleadings, orders, orders on rehearing, briefs, requests, intermediate rulings, photographs, and other written documents.

(2) Evidence received or considered by the Indiana board.

(3) A statement of whether a site inspection was conducted, and, if a site inspection was conducted, either:

(A) a summary report of the site inspection; or

(B) a videotape transcript of the site inspection.

(4) A statement of matters officially noticed.

(5) Proffers of proof and objections and rulings on them.

(6) Copies of proposed findings, requested orders, and exceptions.

(7) Either:

(A) a transcription of the audio tape of the hearing; or

(B) a transcript of the hearing prepared by a court reporter.

---

5. Ind.Code Ann. §§ 6–1.1–30–1.1, 14 (West Supp.2001).

6. Ind.Code Ann. §§ 6–1.5–1–3, 4–1 (West Supp.2001).

7. Ind.Code Ann. § 6–1.1–15–6 (West 2000) (repealed 2002) required the board to assemble a certified transcript of the proceedings for judicial review, but expressly stated that "the transcript shall not include the evidence

compiled by the board with respect to the proceedings." Because the evidence compiled by the board was not included in the transcript, "the evidence must be reconstructed on judicial review through the introduction of the same exhibits, the same testimony of the same witnesses, or the testimony of the hearing officer." *State Bd. of Tax Comm'rs v. Gatling Gun Club, Inc.*, 420 N.E.2d 1324, 1329 (Ind.Ct.App.1981).

Ind.Code Ann. § 6–1.1–15–6(b) (West Supp.2001) (effective Jan. 1, 2002).

A Tax Court appeal will now be heard on that record, subject to the provisions of the Administrative Orders and Procedures Act in Indiana Code Ann. chapter 4–21.5–5.[8] Relief will be granted if the Board of Tax Review's actions were arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise violate one of the standards listed in Ind. Code Ann. § 4–21.5–5–14(d) (West 1991).

In short, Tax Court appeals will now bear strong resemblance to the review of other agency determinations, like those of the Workers Compensation Board or the Indiana Utility Regulatory Commission, presently undertaken by the Court of Appeals. Judge Shields summarized these appeals in language approximating the present basis for tax appeals:

> Judicial review of an administrative decision is limited to a determination of whether the agency has jurisdiction over the matter and whether its order is in accordance with proper legal procedure, is based on substantial evidence, and does not violate any constitutional, statutory, or legal principle.

*Ind. Civil Rights Comm'n v. Wellington Village Apartments*, 594 N.E.2d 518, 529 (Ind.Ct.App.1992) (citations omitted).

From these appeals heard by the Court of Appeals and the Tax Court, this Court has discretion to grant further review. App. R. 4(A)(2).

**The Garcias' Assessment of "A + 6"**

This case is thus a trailing example of assessment from the era before *Town of St. John,* 702 N.E.2d 1034. In *Garcia II,* the Tax Court found the State Board's methodology for assessing the Garcias' home above the grade of "A" to be arbitrary and capricious. 743 N.E.2d at 818. The Board argues that the Tax Court failed to give proper deference to the State Board's final determination. (Appellant's Br. at 13–15.) In response, the Garcias claim that the Board exceeded its authority by adopting new assessment methodology and that the methodology was arbitrary and capricious.[9] (Appellees' Br. at 3–5.)

*A. Assessment's Basic Principles.* For residential improvements, true tax value is calculated by determining the whole dollar cost of reproducing the improvement as determined under the State Board's rules and regulations. *See* 50 IAC 2.1–3–4 (1992). Assessors assign a grade factor ranging from "A" to "E" to account for the dwelling's particular construction qualities and amenities. *See* 50 IAC 2.1–3–2 (1992).

"C" grade dwellings, defined as "[m]oderately attractive dwellings constructed with average quality materials," are considered average and assigned a grade factor of 100 percent of the replacement cost as determined by the State Board. 50 IAC 2.1–3–2(a), (b) (1992). The highest major classification grade is "A," which is defined as a dwelling of "outstanding architectural style and design" that is "constructed with the finest quality materials

---

8. *See* Ind.Code Ann. § 6–1.1–15–5(b) (West Supp.2001) (effective Jan. 1, 2002).

9. The Garcias also claim that the "A + 6" grade violated Indiana Code § 4–22–2–19.1. (Appellees' Br. at 11.) The statute provides that it is unlawful for a state agency to "retroactively apply a change in the agency's interpretation of a ... regulation ... if that change increases a taxpayer's liability." Ind. Code Ann. § 4–22–2–19.1 (West 1998). As we discuss below, because the Garcias' home was of such high quality, the State Board had to extrapolate from its existing guidelines, not change an interpretation, to grade the dwelling. The statute is inapplicable in this case.

and workmanship throughout." *Id.* at 2(b). Further on, the regulation states that "[m]ansion type dwellings fall within the upper limits of the grade ranging from AA to AAA [grades "A + 4" to "A + 10"]." *Id.;* 50 IAC 2.1–3–4(f) (1992). "A" grade dwellings have a grade factor of 160 percent of the base price. 50 IAC 2.1–3–2(b) (1992).

Because dwellings can fall between the major classifications, the Board's regulations provide a system of pluses and minuses to fine-tune the grades.[10] *See* 50 IAC 2.1–3–4(f) (1992). Grades that fall above "A" are indicated by "+1" through "+10," with each increment representing an increase in value over the base grade of twenty percent. *Id.* The Garcias' grade of "A + 6" represents a factor of 280 percent. *See id.*

Within the State Board's regulations, assessors must use models, which are "conceptual tool[s] used to replicate re-placement cost of a given structure using typical construction materials." 50 IAC 2.1–3–2(a) (1992). Included within the regulations are "[g]raded photographs of representative dwellings ... [to] assist the assessor in selecting the proper grade." *Id.; see also* 50 IAC 2.1–3–6 (1992). Photographs of comparable homes with grades from "A" to "E–1" are shown in the regulation. *See* 50 IAC 2.1–3–6 (1992). No home graded above an "A" is pictured. *See id.* Additionally, a "Grade Specification Table" describes the general characteristics of dwellings within each major classification.[11] 50 IAC 2.1–3–2(b) (1992).

*B. Methodology for Garcias' Grade.*
In reaching the "A + 6" grade, the State Board started with the actual construction cost of the Garcias' home, $1,634,543. The State Board subtracted items not assessed in Indiana or assessed as separate line items.[12] The net cost equaled $918,677.

---

10. The State Board's regulations governing intermediate grading say:

> Dwellings sometimes fall in between the major classifications, or at intermediate grade levels. A method of interpolation is therefore built into the system whereby intermediate grade levels are indicated by suffixing the letter symbol ("A" through "E") of the major classification with one of the following.
> +/–2 to indicate that the grade falls halfway between the assigned grade classification and the grade immediately above or below it.
>> Example: a grade of "C + 2" indicates that the quality and design grade classification is estimated to fall halfway between "C" and "B" (average to good construction).
> +/–1 to indicate that the grade falls slightly above or below the assigned grade classification (or at a point approximately 25% of the interval between the assigned grade classification and the grade immediately above or below it).
>> Example: a grade of "C + 1" indicates that the quality and design grade classification is estimated to be slightly better

> than average or approximately halfway between a "C" grade and a "C + 2" grade.
> Grades that fall below "E" (which represents a factor of 40%) are indicated by "–1" through "–4" (each of which represents a reduction of the factor by 10%, so that "E–4" equals a factor of 0%).
> Grades that fall above "A" (which represents a factor of 160%) are indicated by "+1" through "+10" (each of which represents an increase of the factor by 20%, so that "A + 10" equals a factor of 360%). Grade "A + 4" may be designated "AA", and grade "A + 10" may also be designated as "AAA".

> 50 IAC 2.1–3–4(f) (1992).

11. For instance, an "A" grade dwelling is described as having general characteristics such as high grade plumbing fixtures, high quality cabinets, hardwood or high quality carpet, and outstanding architectural style. 50 IAC 2.1–3–2(b) (1992).

12. Items not assessed included landscaping, fill dirt, extra concrete, a fence, and a security system totaling $228,332. (Joint Exh. 50 at

The Board then determined that the applicable regulations concerning grade were based upon 1985 reproduction costs.

■ Therefore, the State Board equated the Garcias' 1991 construction costs with the 1985 data. To do this, it discounted the 1991 construction costs by a consumer price index deflator [13] to arrive at an adjusted 1985 cost of $741,005 for the Garcias' home. Additionally, because the 1985 cost schedules in the State Board's Manual were further reduced by fifteen percent, the State Board then reduced the $741,005 by fifteen percent to reach the figure of $629,854. This figure, the State Board determined, represented the adjusted construction cost of the Garcias' home.[14]

Finally, the State Board calculated that a grade of "C" on the Garcias' home would have equaled a reproduction cost of $217,900. To arrive at an appropriate grade factor, the State Board divided $629,854 by $217,900, which equaled approximately 289 percent. The State Board rounded that figure to 280 percent for a final grade of "A + 6."

In sum, the Garcias' grade of "A + 6" was arrived at by deflating their dwellings' actual cost of construction to a 1985 cost level, then dividing by the grade "C" reproduction costs from the State Board's cost schedules, to arrive at a rounded grade multiplier of 280 percent.

■ *C. Review of the Tax Court's Decision.* We review Tax Court decisions under a "clearly erroneous" standard of review. In doing so, we recognize that the Indiana Tax Court was established to develop and apply specialized expertise in the prompt, fair, and uniform resolution of state tax cases. *Ind. Dep't of State Revenue v. Caylor–Nickel Clinic, P.C.,* 587 N.E.2d 1311 (Ind.1992).

In reviewing the State Board's approach in *Garcia II,* the Tax Court again found fault with the State Board's methodology and directed that a grade of "A" be entered on the Garcias' home. 743 N.E.2d at 821. Despite acknowledging that the "State Board's method of calculating grade in this case does make some sense," *Id.* at 820 n. 7, the Tax Court held that "no support exists in the regulation for the above calculation." *Id.* at 820. The court further stated, "[I]f the State Board wishes to use such a method when dealing

8.) The items separately assessed included the pool house, tennis court, tennis pavilion, tool shed, pool, and spa, with a total value of $487,534. (*Id.* at 9.)

13. The consumer price index deflator was based on the consumer price index from the Bureau of Labor Statistics. (*Id.*)

14. The Garcias argue that the State Board's use of consumer price index data and an actual construction cost multiplier violate due process because they did not have an opportunity to rebut the figures. (Appellees' Br. at 15.) We disagree. Due process requirements can be adequately protected "by procedures imposed *after* the government deprivation acts against the property." *Clifft v. Ind. Dept. of State Revenue,* 660 N.E.2d 310, 318 (Ind. 1995) (emphasis in original) (citation omitted). "[W]here property rights are involved, mere postponement of the opportunity to be heard is not a denial of due process if the opportunity ultimately given is adequate." *Id.* (citing *Commissioner v. Shapiro,* 424 U.S. 614, 631–32, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976)). While the Garcias have argued to both this Court and the Tax Court that they have had no opportunity to rebut the State Board's evidence, they have not presented alternative numbers or demonstrated how the State Board's calculations were wrong. (*See* Joint Exh. 51 at 40; Appellees' Br. at 15.) Conclusory assertions that the State Board's formula was erroneous are insufficient to meet the taxpayers' burden of demonstrating that the final determination is invalid. *See State Bd. of Tax Comm'rs v. Indianapolis Racquet Club, Inc.,* 743 N.E.2d 247, 252 (Ind. 2001) (citations omitted).

with future appeals ... it must be included in the regulations." *Id.* at 820 n. 7.

Like other courts conducting judicial review of administrative actions, the Tax Court owes a certain deference to the executive body to which is assigned the principal responsibility for carrying out the mission. The Tax Court may reverse a final determination of the State Board only when its decision is unsupported by substantial evidence, is arbitrary or capricious, constitutes an abuse of discretion, or exceeds statutory authority. *Wetzel Enters., Inc. v. State Bd. of Tax Comm'rs,* 694 N.E.2d 1259 (Ind.Tax 1998). The taxpayer bears the burden of demonstrating that the State Board's final determination is invalid. *Clark v. State Bd. of Tax Comm'rs,* 694 N.E.2d 1230 (Ind.Tax 1998).

Indiana Code Ann. § 6–1.1–35–1 (West 1998) establishes the following duties of the State Board:

(1) interpret the property tax laws of this state;

(2) instruct property tax officials about their taxation and assessment duties and ensure that the county assessors, township assessors, and assessing officials are in compliance with section 1.1 of this chapter;

(3) see that all property assessments are made in the manner provided by law; and

(4) develop and maintain a manual for all assessing officials and county assessors concerning:

(A) assessment duties and responsibilities of the various state and local officials;

(B) assessment procedures and time limits for the completion of assessment duties;

(C) changes in state assessment laws; and

(D) other matters relevant to the assessment duties of assessing officials, county assessors, and other county officials.

Given this clear legislative grant of authority to develop regulations and interpret the property tax law within Indiana, the Tax Court should have accorded more deference in this instance to the State Board's actions.

The Tax Court's ruling that any methodology not appearing within the regulations would be arbitrary and capricious effectively prevents grading of dwellings above "A." The regulation at issue, however, 50 IAC 2.1–3–4(f) (1992), clearly contemplates that dwellings will fall above grade "A." On this point, the regulation states:

Grades that fall above "A" (which represents a factor of 160%) are indicated by "+1" through "+10" (each of which represents an increase of the factor by 20%, so that "A + 10" equals a factor of 360%). Grade "A + 4" may be designated "AA", and grade "A + 10" may also be designated as "AAA".

50 IAC 2.1–3–4(f) (1992).

The Tax Court's conclusion, therefore, flies in the face of the regulations. First, regulation 2.1–3–4(f) explicitly contemplates ten plus factors above "A." Second, the regulation assigns specific percentage increments to these higher grades. A "C" house has a grade factor of 100 percent, an "A" house has a grade factor of 160 percent, and an "A + 6" house has a grade factor of 280 percent. And third, while not providing pictorial representations, regulation 2.1–3–2(b) does describe houses at or above "A + 4" as "mansion type dwellings." 50 IAC 2.1–3–2(b) (1992).

Under this scheme, graded dwellings can be thought of as falling somewhere on a bell-shaped curve, with the few houses of the poorest quality construction (grades "E–4" to "E–1") on one end of the curve

and the few mansions of the highest quality construction ("A + 4" to "A + 10") on the opposite end. The average house (the "C" classification) falls somewhere around the mean of the curve.

Because few homes fall within these fringe categories (below "E" and above "A"), the regulations provide specific comparisons to guide assessors only for grades between "A" and "E–1." This is understandable. If the State Board tries to provide assessors with a picture of a dwelling it considers of the highest quality, what happens when an even more expensive and luxurious home is built in the future?

Predictably, it is only those few dwellings of especially high quality that will be heard to complain. No homeowner is likely to challenge a tax appraisal as too low.

In this rare situation, the Garcias built a home so upscale that the "comparables" available to assessors were simply not comparable. There were no general specifications or graded photographs to guide the local assessors. But the State Board did have the general description of "mansion type dwellings" and specific grade factors over the average "C" classification

from which to work. *See* 50 IAC 2.1–3–2(b), 4(f) (1992).

As the Tax Court agreed in *Garcia II*, the State Board's methodology of using discounted construction costs in comparison to reproduction costs derived from the regulations for average "C" dwellings makes sense. 743 N.E.2d at 820 n. 7. It is a reasonable approach that results in an objectively verifiable grading. Given that the Garcias' house was one of the few dwellings falling within the elevated "A" category, it was within the State Board's discretion to identify the rationale for grading the Garcias' home at "A + 6."

The Garcias argue, in essence, that because the State Board did not contemplate a home of this caliber it must assess the Garcias' home based upon the best it did contemplate and assign a grade of "A." We disagree. The State Board found an objective, logical method to assess a literally incomparable property within the existing guidance.[15] This was not arbitrary or capricious.

We conclude that the State Board acted within its statutory authority and assessed the Garcias' residence using a methodology that was neither arbitrary nor capricious.[16]

---

**15.** The Garcias argue at length in their brief that "most of the homes in the Garcias' neighborhood were of comparable quality to the Garcias' home." (Appellees' Br. at 18.) However, the assessments of nearby properties, which the Garcias cite, lead us to a different conclusion. (*See* Appellees' App. at 21.) The six neighbors the Garcias reference received initial assessments ranging from "A + 3" (220 percent) to "A" (160 percent). (*Id.*) The County and State Boards lowered these assessments to between "A" (160 percent) and "B + 2" (140 percent). (*Id.*) The Garcias' initial assessment of "A + 10" (360 percent) was upheld on review by the County Board, then lowered by the State Board to "A + 6" (280 percent). Before and after review, the Garcias' home was viewed as a higher quality property.

The Garcias also introduced the testimony of their home's builder, James Rans, who stated that the Garcias' neighbors' homes were of the "same quality," except that the Garcias' home was "bigger." (*Id.* at 56.) After Rans testified that he had built several of the Garcias' neighbors' homes, the State Board hearing officer requested that the Garcias provide any available construction cost data on a particular neighborhood property. (*Id.* at 80–82, 92.) The Garcias failed to provide this information. (Joint Exh. 51 at 18.)

**16.** The Board's latitude in carrying out its responsibilities is not, of course, unlimited. *See, e.g., State Board of Tax Commissioners v. New Castle Lodge #147, Loyal Order of Moose, Inc.,* 765 N.E.2d 1257 (Ind.2002), where the Board repeatedly applied an incorrect exemption standard to the fraternal

The Garcias' home was properly graded at "A + 6."

### Conclusion

We affirm the decision of the State Board of Tax Commissioners.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.

---

lodge, then switched focus mid-stream and argued that the lodge did not meet the "predominate use" standard for partial property tax exemption. We remanded for reconsideration of the exemption allowed.

Here, in contrast, the Garcias built a home more luxurious than any "comparables" pic-

tured in the Board's assessment manual. The Board extrapolated from existing standards to assess the home at an "A + 6" grade as contemplated by Board regulations and allowed the taxpayer a reasonable opportunity to respond to its assessment methodology. This was an appropriate exercise of the Board's discretion.