## WITTENBERG LUTHERAN VILLAGE ENDOWMENT CORPORATION, Petitioner,

v.

## LAKE COUNTY PROPERTY TAX ASSESSMENT BOARD OF APPEALS, Respondent.

No. 45T10–0202–TA–24.

Tax Court of Indiana.

Jan. 24, 2003.

Robert A. Anderson, Krieg Devault Galvin, Hammond, IN, Attorney for Petitioner.

Paul S. Ward, Attorney at Law, Indianapolis, IN, Attorney for Respondent.

## ORDER ON PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

FISHER, J.

Wittenberg Lutheran Village Endowment Corporation ("Wittenberg") appeals the final determination of the Indiana Board of Tax Review ("Indiana Board") denying it a property tax exemption for the 1999 tax year. The matter is before the Court on the parties' cross-motions for summary judgment. The sole issue for this Court to decide is whether the portion of Wittenberg's retirement community known as the "Villas" qualifies for a charitable exemption under Indiana Code § 6–1.1–10–16.

### FACTS AND PROCEDURAL HISTORY

Wittenberg is an Indiana not-for-profit corporation affiliated with the Lutheran Church.[1] It owns and operates Wittenberg Lutheran Village ("Village"), an integrated retirement community in Crown Point, Indiana. The Village includes a nursing home,[2] an assisted living facility,[3] a chapel, and eighteen buildings, each containing four residential units. Collectively, these eighteen buildings are known as the "Villas."

The Villas cater to independent, active seniors who are at least sixty years old.[4]

1. Wittenberg is owned by approximately 160 northern Indiana Lutheran congregations.

2. Wittenberg's nursing home, Wittenberg Manor, caters to those seniors who need either short or long term care. Certain wings of the facility are devoted to special purposes, such as Alzheimer's care, hospice, or intensive nursing care.

3. Wittenberg's assisted living facility, Wittenberg Suites, provides its residents with individual apartments that are equipped with an emergency response system. The Suites provide a complete dining program, housekeeping, and transportation services. A front-desk staff is on-duty twenty-four hours per day.

4. The residents' spouses are eligible to live in the Villas, even if they themselves are not yet

In addition to providing the amenities found in traditional apartment living,[5] the Villas offer many unique and special services to its residents. For instance, each apartment is equipped with safety features (such as bathroom grab bars) and is wheelchair accessible. All units are built on a crawl-space foundation, providing less stress on elderly bones and joints than slab foundations.

Chaplaincy and worship services are available to all Villa residents.[6] Villa residents may participate in a wide range of free planned group activities and have free access to exercise equipment within the Village. They may use the Village minibus for regularly scheduled shopping, planned group outings, and health-related appointments at nearby medical facilities. In addition, Villa residents may volunteer in the assisted living facility or the nursing home.

For an additional fee, Villa residents may dine in the central dining room of the nursing home or the assisted living facility. Regularly scheduled housekeeping is also available for an additional fee. If needed, a resident may purchase assistance with daily activities such as bathing, dressing, grooming, feeding, as well as administering medication. The Village has a medical director who will see residents of the Villas for scheduled appointments. Independently certified physical therapists, as well as dentists and podiatrists, also schedule regular on-site office hours. The Villa residents can contact the round-the-clock nursing staff at the nursing home for any medical emergencies.

Pursuant to an agreement with Wittenberg (Villa Agreement), a resident may purchase a right of occupancy in a Villa unit for a three, five, seven or fifteen-year term, paying both a monthly Resident's Fee (which is prepaid through an advance deposit) and a Service Fee (which may be drawn against that deposit).[7] Title in the unit does not transfer to the resident, but is always maintained by Wittenberg. Accordingly, at the end of the occupancy term, residents may either leave the unit or enter into a new agreement with Wittenberg.

If in the event a resident leaves the Villas prior to the expiration of its occupancy term, the Resident's Fee is, for the most part, refundable. Furthermore, the Villa Agreement provides:

> It is the declared policy of the HOME that the RESIDENT will not be terminated solely by reason of the financial inability of the RESIDENT to pay the monthly fee, if the RESIDENT has applied for and established facts which justify special financial consideration and dispensation, and if such application can be granted without impairing the ability of HOME to operate on a sound financial basis and maintain the HOME for other residents. Further, the RESIDENT agrees not to impair his or her ability to meet financial obligations here-

---

age sixty. Most Villa residents are between the ages of eighty and eighty-two.

5. Each resident has exclusive use of his or her own apartment, which includes two bedrooms, a private kitchen and bath, individually controlled heat and air-conditioning, smoke detectors, a master television antenna, as well as access to a coin-free washer and dryer. Wittenberg provides maintenance of the apartments and grounds.

6. Village residents are not required to be members of the Lutheran Church.

7. For instance, a 15–year term of occupancy costs $76,600, which is all prepaid. Each month, $425 is drawn against that deposit to cover the monthly Residence Fee. The Monthly Service Fee is an additional $200 per month. If the resident fails to pay the service fee, the money is withdrawn against the advance deposit.

under by transferring assets after securing occupancy, without the consent of the home other than to meet ordinary and customary living expenses.

(Cert. Admin. R. at 8–9.) Residents of the Villas have priority, subject to availability, to be moved to the assisted living or nursing home facilities within the community should the need arise.

Prior to 1999, the Village (in its entirety) was exempt from Indiana's property tax pursuant to the charitable exemption of Indiana Code § 6–1.1–10–16. On December 5, 2000, however, the Lake County Property Tax Assessment Board of Appeals ("PTABOA") issued a notice to Wittenberg revoking the portion of the exemption as it applied to the Villas for the 1999 tax year.[8] Wittenberg subsequently sought review of the PTABOA's revocation with the State Board of Tax Commissioners (State Board). After an administrative hearing, the Indiana Board [9] issued a final determination upholding the PTABOA's revocation of the Villas' exemption.

On February 27, 2002, Wittenberg timely filed an original tax appeal, naming the PTABOA as Respondent.[10] On August 14, 2002, the PTABOA filed a motion for summary judgment. On August 15, 2002, Wittenberg filed its motion for summary judgment. The Court held a hearing on both motions on November 14, 2002. Additional facts will be supplied as necessary.

## STANDARD OF REVIEW

■ This Court gives great deference to final determinations of the Indiana Board when it acts within the scope of its authority. *Miller Village Prop. Co., LLP v. Indiana Bd. of Tax Review,* 779 N.E.2d 986, 988 (Ind. Tax Ct.2002). Consequently, the Court will reverse a final determination of the Indiana Board only if it is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory jurisdiction, authority, or limitations;

(4) without observance of procedure required by law; or

(5) unsupported by substantial or reliable evidence.

IND.CODE § 33–3–5–14.8(e)(1)–(5) (Supp.

---

**8.** The PTABOA did not, however, contest the charitable exemption as it applied to Wittenberg's nursing home, assisted living facility, and chapel.

**9.** On December 31, 2001, the legislature abolished the State Board. Pub.L. No. 198–2001, § 119(b)(2). Effective January 1, 2002, the legislature created the Indiana Board of Tax Review (Indiana Board) as "successor" to the State Board. IND.CODE §§ 6–1.5–1–3; 6–1.5–4–1 (Supp.2001); Pub.L. No. 198–2001, § 95. Consequently, when a final determination was issued in Wittenberg's appeal in January 2002, it was issued by the Indiana Board.

**10.** Effective January, 1, 2002, the legislature also changed the requirements for filing an original tax appeal. Indeed, Indiana Code § 6–1.1–15–5(b)(1) now provides that the fol-

lowing are parties to judicial review of a final determination by the Indiana Board: "[a][ ] township assessor, county assessor, member of a county property tax assessment board of appeals, or county property tax assessment board of appeals that made the original assessment determination under appeal[.]" IND. CODE § 6–1.1–15–5(b)(1). *See also* Ind. Tax Court Rule 4(B)(2)(a) (2002) (providing that "[i]n original tax appeals initiated by taxpayers, the named respondents shall be as follows: ... the local governmental official or entity that made the original assessment valuation, exemption determination, or other determination under the tax laws that was the subject of the proceedings before the Indiana Board of Tax Review").

2001).[11]

Summary judgment is proper only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See* Ind. Trial Rule 56(C). *See also Dana Corp. v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1244, 1246 (Ind. Tax Ct.1998). Cross motions for summary judgment do not alter this standard. *Salin Bancshares v. Indiana Dep't of State Revenue*, 744 N.E.2d 588, 591 (Ind. Tax Ct.2000).

### DISCUSSION AND ANALYSIS

■ While all tangible property in Indiana is generally subject to taxation, *see* IND.CODE § 6–1.1–2–1, the legislature has provided that "[a]ll or part of a building is exempt from property taxation if it is owned, occupied, and used ... for educational, literary, scientific, religious, or charitable purposes." IND.CODE § 6–1.1–10–16(a). *See also* IND. CONST. art. X, § 1 (enabling the legislature to grant such an exemption.) At issue in this case is whether the Villas are owned, occupied, and used for a charitable purpose and therefore exempt from property tax under Indiana Code § 6–1.1–10–16(a).

The PTABOA's position is that because the Villas do not cater to the ill or infirm, they are nothing more than a traditional apartment complex. Consequently, it asserts that the Indiana Board did not abuse its discretion in denying the Villas a property tax exemption when it held

> [t]he property is used as a normal residence, pure and simple. The occupants may avail themselves of certain amenities that make their lives more pleasant, but the Board cannot find a meaningful difference between the benefit the Villa

residents receive and the benefit that any other neighborhood association or private community may provide its residents who have selected to live there based on the comforts afforded them by the organizational structure.

[ ] Residents of the Villas are by definition not in need. They are necessarily financially sound and physically well or else they would not be allowed to enter the agreements with [Wittenberg], and could be asked to leave should that physical or financial status change.

(Cert. Admin. R. at 87–88.)

Wittenberg, on the other hand, explains that the Village is designed to "provide a suitable environment for elderly persons where they may have peace, care and security in a Christian atmosphere." (Pet'r Br. at 3 (internal citation omitted).) In turn, because seniors require different types of care at different stages of their later years, the Village offers a "continuum of care" to meet those varying needs. "The Villas ... provide one element of [that] continuum of care" in that its residents "have a variety of services available to them ... that are not available to individual elderly persons residing in their own homes. Transportation, social interaction, housekeeping, on-sight medical care and housing ... are a few of the more important benefits[.]" (Pet'r Br. at 9–11.) The provision of these benefits, Wittenberg argues, constitutes a charitable purpose. Wittenberg is correct.

Nearly seven years ago, this Court interpreted the meaning of "charitable purpose" in a case with a fact pattern very similar to this one: *Raintree Friends Housing, Inc. v. Indiana Department of*

---

**11.** Our Supreme Court recently stated in dictum, however, that the Tax Court would apply the standard of review set forth in the Administrative Orders and Procedures Act, Indiana Code § 4–21.5–5–14(d), and not Indiana Code § 33–3–5–14.8. *State Bd. of Tax Comm'rs v. Garcia*, 766 N.E.2d 341, 345 (Ind.2002).

*State Revenue,* 667 N.E.2d 810 (Ind. Tax Ct.1996). In *Raintree,* the taxpayers, owners of several assisted living/congregate support facilities in Indiana, were entitled to a charitable exemption from Indiana's gross income tax, sales tax, and food and beverage tax. The Court, in reviewing the facts of that case, stated:

In addition to providing the amenities found in traditional apartment living, the Retirement Homes offer many unique and special services to their residents. Specifically, each apartment is equipped with hallway and bathroom grab bars, as well as emergency pull cords and smoke detectors which alert the 24 hour support services office. Some of the apartments are specially designed to accommodate persons in wheel chairs. On-site cafeterias serve three meals each day seven days a week. Qualified nurses [aides] or L.P.N.s are on staff to assist residents with their medications and provide other minor medical testing and assistance. An activities director plans on and off site social functions, takes residents on errands, and arranges for clergy from the community to come in and conduct Sunday worship services. A variety of pay-for-use services are specially provided for residents who need assistance with tasks such as bathing, doing laundry, housekeeping, scheduling and attending doctor's visits, and running errands.

Before admitting residents, the Retirement Homes require that prospective residents provide proof that they are financially able to live independently or provide their own care givers. Prospective residents who do not meet these requirements are denied admittance. However, if a resident has difficulty paying his or her monthly rent, the Retirement Home works with that resident to find additional resources or reduces specific costs so that the resident can continue to live in the facility. Furthermore, if a resident is no longer ambulatory or mentally alert, the Retirement Home will assist the resident in obtaining private duty care or moving to a nursing home or other facility designed to meet his or her needs.

*Raintree Friends Housing, Inc. v. Indiana Dep't of State Revenue,* 667 N.E.2d 810, 812 (Ind. Tax Ct.1996) (footnotes omitted).

While the Court finds it hard to distinguish the facts in this case from those in *Raintree,* the PTABOA contends they are distinguishable. Specifically, it asserts "there are neither medical personnel nor cafeteria facilities located in the Villas." [12] (Resp't Mot. for Summ. J. at 6.) The PTABOA misses the point.

In *Raintree,* this Court stated:

Caring for the aged is a recognized benefit to the community at large and society as a whole. Indiana law recognizes that the aged require care and attention entirely independent of financial needs, and that present day humanitarian principles demand that those in their declining years have the opportunity to live with as much independence as their strength will permit, in as pleasant and happy surroundings as their finances will reasonably justify. Thus, by meeting the needs of the aging, namely, relief of loneliness and boredom, decent housing that has safety and convenience and is adapted to their age, security, wellbeing, emotional stability, and attention

---

12. The PTABOA refers to the fact that in *Raintree,* residents were required to eat at least one meal per day in a central cafeteria. The apartments in *Raintree* were also equipped with emergency pull-cords for alerting the on-site nursing staff.

to problems of health, a charitable purpose is accomplished.

*Id.* at 814–15 (internal citations and punctuation omitted). Accordingly, and contrary to the PTABOA's rationale, the needs of senior citizens are not exclusively financial, nor are they merely health-related. Indeed, seniors also need a sense of community and involvement. *Id.* at 815. Seniors need a sense of security and safety. *Id.* Seniors need social interaction. *Id.* Seniors need supportive services that enable them to live more independently for a longer period of time. *Id.* Seniors need to function at active levels. *Id.* The Villas meet all these needs and are thus owned, occupied, and used for a charitable purpose.

## CONCLUSION

In its final determination, the Indiana Board stated "in *Raintree* . . . [the Court] may have intended for such arrangements to be considered charitable, but the Board cannot reach that conclusion." (Cert. Ad-min. R. at 88.) Under Indiana Code § 33–3–5–14.8(e)(1), the Board's final determinations must be in accordance with the law, which includes following existing precedent such as the Court's holding in *Raintree.* The final determination of the Indiana Board is not in accordance with the law and is therefore REVERSED.

For the reasons stated above, the Court now GRANTS Wittenberg's motion for summary judgment and DENIES the Lake County Property Tax Assessment Board of Appeals' motion for summary judgment. The case is REMANDED with instructions to grant the charitable exemption to Wittenberg for the Villas.

SO ORDERED THIS 24th DAY OF JANUARY, 2003.