**AMERICAN UNITED LIFE INSURANCE COMPANY, Petitioner,**

v.

**James P. MALEY, Jr., Assessor of Center Township, Marion County, Respondent.**

**No. 49T10–0210–TA–117.**

Tax Court of Indiana.

Feb. 13, 2004.

Transfer Denied May 14, 2004.

---

Stephen H. Paul, Brent A. Auberry, Baker & Daniels, Indianapolis, IN, Attorneys for Petitioner.

Thomas F. Bedsole, Jeffrey S. Dible, Locke Reynolds LLP, Indianapolis, IN, Attorneys for Respondent.

FISHER, J.

American United Life Insurance Company (AUL) appeals the Indiana Board of Tax Review's (Indiana Board) final determination valuing its real property for the 1995 tax year. AUL presents multiple issues for this Court's consideration, which the Court restates as:

I. Whether the grade of AUL's building should have been reduced from an "A–1" to "A–2;"

II. Whether AUL's land should have been valued at $75 per square foot under the Marion County Land Order (land order); and,

III. Whether AUL's land should have received a negative influence factor.

### FACTS AND PROCEDURAL HISTORY

AUL owns an entire city block in downtown Indianapolis, on which its 38–floor office building stands. For the 1995 property tax assessment year, the Center Township Assessor (Assessor) assigned AUL's building an "A" grade factor and valued its land at $75 per square foot. AUL appealed its assessment to the Marion County Board of Review (BOR); while the BOR reduced AUL's grade to "A–1," it denied all other requested relief.

AUL then appealed its assessment to the State Board of Tax Commissioners (State Board), alleging that its grade should be reduced to "A–2;" its land was incorrectly valued under the land order; and, a negative influence factor should be applied to its land. On October 25, 2000, the State Board held an administrative hearing on the matter; on September 5,

2002, the Indiana Board[1] issued a final determination in which it denied AUL's requested relief.

On October 15, 2002, AUL initiated an original tax appeal. This Court heard the parties' oral arguments on November 3, 2003. Additional facts will be supplied as necessary.

## ANALYSIS AND OPINION

### Standard of Review

 This Court gives great deference to final determinations of the Indiana Board when it acts within the scope of its authority. *Wittenberg Lutheran Vill. Endowment Corp. v. Lake County Prop. Tax Assessment Bd. of Appeals*, 782 N.E.2d 483, 486 (Ind. Tax Ct.2003), *review denied*. Consequently, the Court may reverse a final determination of the Indiana Board only if it is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory jurisdiction, authority, or limitations;

(4) without observance of procedure required by law; or

(5) unsupported by substantial or reliable evidence.

IND.CODE § 33–3–5–14.8(e)(1)–(5) (West Supp.2003). The party seeking to overturn the Indiana Board's final determination bears the burden of proving its invalidity. *See Osolo Township Assessor v.*

*Elkhart Maple Lane Assocs., L.P.*, 789 N.E.2d 109, 111 (Ind. Tax Ct.2003).

## Discussion

### I. GRADE

AUL first asserts that the Indiana Board erred when it failed to reduce the grade of its building from "A–1" to "A–2." AUL is correct.

 The grading of improvements is an important part of Indiana's property tax assessment system. Under that system, improvements are assigned various grades based on their materials, design, and workmanship. *See* IND. ADMIN. CODE tit. 50, r. 2.2–10–3 (1996) (providing that grade is used to adjust the total base reproduction cost in order to account for variations in quality and design); *Whitley Prods., Inc. v. State Bd. of Tax Comm'rs*, 704 N.E.2d 1113, 1116 (Ind. Tax Ct.1998), *review denied.*

For instance, "A" grade buildings are described as "buildings hav[ing] an outstanding architectural style and design ... constructed with the finest quality materials and workmanship. These buildings have a superior quality interior finish with extensive built-in features, and a deluxe heating system and air conditioning system." IND. ADMIN. CODE tit. 50, r. 2.2–10–3(a)(1) (1996). "B" grade buildings are described as "buildings [that] are architecturally attractive and constructed with good quality materials and workmanship. These buildings have a high quality interior finish with abundant built-in features, very good lighting and plumbing fixtures, and a custom heating and air conditioning system." IND. ADMIN. CODE tit. 50, r. 2.2–

---

1. On December 31, 2001, the legislature abolished the State Board of Tax Commissioners (State Board). 2001 Ind. Acts 198 § 119(b)(2). Effective January 1, 2002, the legislature created the Indiana Board of Tax Review (Indiana Board) as "successor" to the State Board. IND.CODE §§ 6–1.5–1–3; 6–1.5–4–1; 2001 Ind. Acts 198 § 95. Thus, when the final determination was issued on AUL's appeal in September 2002, it was issued by the Indiana Board.

10–3(a)(2) (1996). While "[t]he grade selected represents a composite judgment of overall quality and design[,]" in cases where the materials and workmanship are not consistent throughout the construction of a structure "it is sometimes necessary to weigh the quality of individual major components in order to arrive at the proper composite quality rating." IND. ADMIN. CODE tit. 50, r. 2.2–10–3(d) (1996).

█ As the party challenging the final determination of the Indiana Board, AUL was required to submit probative evidence demonstrating that its building was either improperly given an "A–1" grade or improperly denied an "A–2" grade.[2] *See Sollers Pointe Co. v. Dep't of Local Gov't Fin.*, 790 N.E.2d 185, 191 (Ind. Tax Ct.2003) (footnote added). In so doing, AUL was required to submit "specific evidence tied to the descriptions of the various grade classifications." *See id.* (internal quotations, citation omitted).

At the administrative hearing, AUL presented the testimony of its property tax consultant, Ms. Marta Haza (Haza), and its construction engineer consultant, Mr. Thomas Scheele (Scheele). In addition, AUL presented numerous reports prepared by Haza and Scheele. First among these documents was an "Interior Finish Report" (Report). The Report included photographs and descriptions of each of the floors in AUL's building. Based on these descriptions, a grade factor was assigned to each floor.[3] Next, AUL averaged the recommended grades of all 38 floors to arrive at an interior grade factor of 124.741% ("B + 1") for the entire building. (*See* Cert. Admin. R. at 166.) On the theory that the exterior of its building should be graded an "A," AUL then calculated the overall composite grade of "A–2" for the entire building (both interior and exterior).[4] (*See* Cert. Admin. R. at 48 (footnote added).)

---

**2.** The grades represent multipliers that are applied to the subject improvement's base reproduction cost. *Whitley Prods., Inc. v. State Bd. of Tax Comm'rs*, 704 N.E.2d 1113, 1116 (Ind. Tax Ct.1998), *review denied.* "A" grade improvements receive a multiplier of 160%; the multiplier for "B" grade improvements is 120%. *See* IND. ADMIN. CODE tit. 50, r. 2.2–10–3(b)(1)–(2) (1996). Furthermore, "[b]ecause structures sometimes fall between major classifications ... a method of interpolation is built into the system." IND. ADMIN. CODE tit. 50, r. 2.2–10–3(c) (1996). Therefore:

> Plus or minus two (+/2) indicates that the grade falls halfway between the assigned grade classification and the grade immediately above or below it.
>
> \* \* \* \* \*
>
> Plus or minus one (+/1) indicates that the grade falls slightly above or below the assigned grade classification, or at a point approximately twenty-five percent (25%) of the interval between the assigned grade classification and the grade immediately above or below it.

*Id.* Thus, an "A–1" and an "A–2" carry multipliers of 150% and 140%, respectively.

**3.** For example, the Report included photographs of the interior of the 2nd floor and the following description:

> Tenant office space (43% of entire floor): Standard office finish; i.e[.], suspended acoustical ceiling; inset fluorescent lights; painted drywall walls; 2″ vinyl baseboard; metal trim around wood doors (no fire rating). The exceptions are as follows: 2′x2′ carpet tile flooring; a floor-to-ceiling glass perimeter wall separates the tenant space from the lobby area; and, a few textured glass panels pose as demising walls within the tenant space.

(Cert. Admin. R. at 193.) As a result, the Report indicated that an appropriate grade for the 2nd floor should be an "A–1."

**4.** AUL assumed "that the interior finish represented 60%[,] and the exterior [ ] of the building represented 40%[,] of the total base square foot rate of the building." (*See* Cert. Admin. R. at 48.) To arrive at those percentages, AUL added the cost of the interior components, as contained in the Indiana Administrative Code, and compared that total to the base square foot rate. *See* IND. ADMIN. CODE tit.

AUL also submitted a "Common Area Interior Finish Comparison Spreadsheet" (Spreadsheet) to show how its building was similar to several allegedly comparable office buildings in downtown Indianapolis, Indiana. (*See* Cert. Admin. R. at 324–25.) Specifically, the Spreadsheet compared the interior finish of AUL's building with the interior finishes of these comparable buildings: Market Tower—a 31–story office building; First Indiana Plaza—a 28–story office building; and, One Indiana Square—a 36–story office building. (*See* Cert. Admin. R. at 324–25.) These comparable buildings each received an "A–2" grade. (*See also* Cert. Admin. R. at 273, 292, 300.)

For instance, the Spreadsheet made a side-by-side comparison of all the buildings' main lobby floor finishes: "Polished Amerillo Gold granite" (AUL); "Honed & Polished Brown Carnelean granite" (Market Tower); "Polished granite" (First Indiana Plaza); and, "Combination Carrara marble and granite" (One Indiana Square). (Cert. Admin. R. at 324–25.) Haza and Scheele concluded that these finishes were all "fairly comparable" to one another in cost, quality, workmanship, and design. (Cert. Admin. R. at 553–55.) The Spreadsheet also indicated when particular features present in the "A–2" graded buildings were inferior or superior to those of AUL's building. For example, the Spreadsheet stated that the "custom fabricated gypsum board boxed ceiling" in the Market Tower building was a more expensive finish than the "painted gypsum board" ceiling in the main lobbies of the AUL, First Indiana Plaza, and One Indiana Square buildings.[5] (Cert. Admin. R. at 324–25 (footnote added).)

■ AUL's evidence provided a floor-by-floor analysis of the quality of the interior features of its building. Additionally, it compared the interior finishes of its building with those of Market Tower, First Indiana Plaza, and One Indiana Square. Having demonstrated that its building's interior finishes were indicative of "A–2" grade, as well as showing how its building was similar to other buildings with an "A–2" grade, AUL established its prima facie case that its building should have been graded an "A–2."

■ Having made its prima facie case, the burden then shifted to the Assessor to rebut AUL's evidence. *See Clark v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1230, 1233 (Ind. Tax Ct.1998) (stating that once a taxpayer presents a prima facie case, it must be rebutted with substantial evidence). At the administrative hearing, the Assessor first questioned Scheele and Haza. In none of these exchanges, however, did the Assessor offer evidence rebutting their conclusions as contained in the Report and Spreadsheet. Rather, he asked seemingly irrelevant questions such as "[y]ou never worked for [the builders] when they built the [AUL] building, right?" and "did you take into consider-

---

50, r. 2.2–11–6, Schedule C (1996). (*See also* Cert. Admin. R. at 48.) The interior base rate was $23.30 per square foot; the base square foot rate was $38.23 per square foot. (*See* Cert. Admin. R. at 163–64.) AUL multiplied the weighted interior finish grade factor of 124.741% by 60%, and the exterior grade factor of 160% by 40% to arrive at an overall composite grade factor of 140%, or "A–2." (*See* Cert. Admin. R. at 166.)

5. To support this contention, Scheele explained that

[the painted gypsum board ceiling] in the AUL building, it's basically in the same plane, so it's a flat ceiling, more or less. In a custom fabricated gyp[sum] board box ceiling you start getting into different planes of horizontal and vertical surfaces, so it's more difficult to build, it's more expensive, so overall it's a costlier ceiling. (Cert. Admin. R. at 554.)

ation the rental rates of the AUL building?" (Cert. Admin. R. at 561, 564.)

The Assessor also introduced a witness, Mr. Ernest Clark (Clark) of the Center Township Assessor's Office, who testified that the AUL building was "probably an 'A' grade building" because

> [the building is] not a square building[.] And anytime you start adding angles to a building, you increase the cost . . . of the building itself[.] [P]lus[,] the design is inherently more expensive because if you don't have square corners, you use more materials.

> \* \* \* \* \*

> [The building has] a lot of [ ] full-length windows . . . especially the sloping windows on the wings, the top slope . . . [and when] you're using varying types of windows, [ ] you've got less standardization. It's going to . . . cost more[.]

> \* \* \* \* \*

> [The full-length] windows at least appear to be larger than what I consider normal in office buildings. As you can see in the picture here, the subject building, behind it is another office building and the windows look much smaller.[6]

(Cert. Admin. R. 576–79 (footnote added).)

The Assessor also produced another witness from the Center Township Assessor's office, Mr. Frank Corsaro (Corsaro). Corsaro inquired (generally) why AUL chose the comparable buildings it did, as opposed to others. (See Cert. Admin. R. at 585–87.) Corsaro also explained that at the time the AUL building was built in 1982,

he toured the building and thought it was a "beautiful building" that "kind of made downtown." (Cert. Admin. R. at 593.)

The Assessor's evidence simply fails to impeach or rebut AUL's evidence. First, the Assessor did not demonstrate the relevancy of questions such as "[y]ou never worked for [the builders] when they built the [AUL] building, right?" and "did you take into consideration the rental rates of the AUL building?" Consequently, the irrelevant questions do not rebut AUL's composite grade calculation. See Standard Plastic Corp. v. Dep't of Local Gov't Fin., 773 N.E.2d 379, 384 (Ind. Tax Ct.2002) (stating that relevant evidence is such evidence "a reasonable mind might accept as adequate to support a conclusion"). Second, Clark's testimony that the exterior architectural features of the AUL building support an "A" grade does not rebut Haza and Scheele's testimony: they admitted the grade for the exterior of the building should be an "A" grade. (See Cert. Admin. R. at 544.) Furthermore, Cosaro's statements that the AUL building was "beautiful" and "made downtown" are merely conclusions and do not qualify as probative evidence. See Lacy Diversified Indus., Ltd. v. Dep't of Local Gov't Fin., 799 N.E.2d 1215, 1221(Ind. Tax Ct.2003) (finding that statements such as a building is a "grand old building" are nothing more than conclusions and therefore, not probative evidence).

The Assessor failed to rebut AUL's prima facie case. The Court finds that AUL is entitled to an "A–2" grade factor and therefore REVERSES the Indiana Board's final determination.[7]

---

**6.** The Court finds this conclusion unpersuasive; indeed, in photographs objects farther away often appear smaller than objects closer in view.

**7.** The Court notes that in its final determination, the Indiana Board concluded that AUL's evidence failed to establish that it was entitled to a grade reduction because "the Petitioner's description [of its building] does nothing to explain how and to what extent the subject

## II. LAND VALUE

■ Next, AUL contends that its land was improperly valued at $75 per square foot. More specifically, AUL asserts that under the land order, a portion of its land should be valued at $20 per square foot. Again, AUL is correct.

In 1995, land values were determined through the application of land orders. IND. ADMIN. CODE tit. 50, rr. 2.2–4–2, –6 (1996). To develop the land orders, each county had a land valuation commission that collected and analyzed sales data on non-agricultural land (i.e., residential, commercial, and industrial) within the county. IND. ADMIN. CODE tit. 50, r. 2.2–4–2 (1996). *See also* IND. ADMIN. CODE tit. 50, r. 2.2–4–5 (1996). On the basis of that data, the valuation commission recommended a range of values for property in certain areas. IND. ADMIN. CODE tit. 50, r. 2.2–4–2(b) (1996); *see also* IND.CODE § 6-1.1–4–13.6(a) (West 1989) (amended 1997). These values were submitted to the State Board for modification or acceptance and then compiled in a county land valuation order. IND. ADMIN. CODE tit. 50, r. 2.2–4–3 (1996); *see also* IND.CODE § 6-1.1–4–13.6(f)–(h) (West 1989) (amended 1997).

The land values contained within a land order are typically expressed in ranges of "base rates" that are applied to various geographic areas, subdivisions, or neighborhoods based on distinguishing characteristics or boundaries. IND. ADMIN. CODE tit. 50, r. 2.2–4–4(c) (1996). The land order at issue in this case established AUL's property boundaries within "Square 34," bounded by New York Street on the north, Illinois Street on the east, Ohio Street on the south, and Capitol Avenue on the west. (*See* Cert. Admin. R. at 400.) With respect to Square 34, the land order summary provides:

1. $70–$100 per square foot for the southern portion of the property bounded by Ohio Street from Illinois Street to Capitol Avenue;

2. $10–$20 per square foot for the northern portion of the property bounded by New York Street from Illinois Street to Capital Avenue; and,

3. $70–$100 per square foot for a northwest to southeast diagonal portion of the property, which at one time was bisected by Indiana Avenue from Ohio Street to New York Street (Indiana Avenue was vacated in 1979).

(*See* Cert. Admin. R. at 402–04.)

Under the plain meaning of the land order, AUL's land was to be valued at $70–$100 per square foot, *except for* the triangular portion of Square 34 bounded by New York Street to the north and Illinois Street to the east, its hypotenuse being Indiana Avenue. (*See* Cert. Admin. R. at 400.) Land in that triangle is to be valued at $10–$20 per square foot. *See The Precedent v. State Bd. of Tax Comm'rs,* 659 N.E.2d 701, 704 (Ind. Tax Ct.1995) (stating that "[i]n construing a land order, the first and foremost rule of construction is to ascertain and give effect to the land commission's intent, and the most reliable guide to that intent is the language of the land order itself").

deviates from the model, why those deviations deserve an adjustment, and why a subjective (as opposed to objective) adjustment is appropriate." (Cert. Admin. R. at 52.) The Indiana Board misinterpreted AUL's claim: AUL did *not* assert that its building was entitled to a grade reduction to account for its

deviations from the model used to assess it. *See Quality Farm and Fleet, Inc. v. State Bd. of Tax Comm'rs,* 747 N.E.2d 88, 94 (Ind. Tax Ct.2001) (finding that in some circumstances, an improvement's deviation from the model used to assess it may be accounted for via a grade adjustment).

Nevertheless, the Assessor interpreted the land order as authorizing the use of one base rate only: the $70–$100 per square foot rate. Indeed, the Assessor asserts that "there is nothing in [the land order] that indicates that [Assessors are] supposed to apply the ten to twenty dollar range to this triangle and the seventy to a hundred [dollar range] to this triangle." (Oral Argument Tr. at 105.) Additionally, the Assessor contends that because the land order provides for a $70—$100 per square foot base rate along what was formerly Indiana Avenue, the $70—$100 per square foot is the appropriate value "anywhere from the geometric center of Square 34 to the southeast corner or the northwest corner of the city block." (Resp't Br. at 24.) Finally, the Assessor asserts that the $70—$100 per square foot base rate along Ohio Street applies to "land anywhere along Ohio Street between Illinois Street and Capitol Avenue." (Resp't Br. at 24.)

 The Assessor's interpretation of the land order effectively ignores the $10–$20 base rate range assigned to the triangle of land at the northeastern corner of Square 34. In reading a land order, however, "all language used . . . is presumed to have meaning." *The Precedent,* 659 N.E.2d at 705 (citations omitted). Furthermore, this Court will "read the [land order] as a whole, and not sections or parts of it piecemeal." *Roehl Transp., Inc. v. Indiana Dep't of State Revenue,* 653 N.E.2d 539, 542 (Ind. Tax Ct.1995)

(citation omitted).[8] Consequently, under the plain meaning of the *entire* land order, the Assessor must apply both the $70–$100 per square foot base rate range and the $10–$20 per square foot base range, as defined, in assessing AUL's land. Therefore, the Court REVERSES the Indiana Board's final determination valuing AUL's land at $75 per square foot.[9]

## III. NEGATIVE INFLUENCE FACTOR

 Finally, AUL asserts that it is entitled to a negative influence factor of 25% to its parcel. AUL is incorrect.

 "An influence factor 'refers to a condition peculiar to the acreage tract that dictates an adjustment to the extended value to account for variations from the norm.' " *Quality Farm and Fleet, Inc. v. State Bd. of Tax Comm'rs,* 747 N.E.2d 88, 91 (Ind. Tax Ct.2001) (quoting IND. ADMIN. CODE tit. 50, r. 2.2–4–17(c)(8) (1996)). Such variations are expressed as a percentage that "represents the composite effect of the factor that influences the value." 50 IAC 2.2–4–17(c)(8). For instance, an influence factor for "misimprovement" is used when the parcel does not have the same use as surrounding parcels. *See* IND. ADMIN. CODE tit. 50, r. 2.2–4–10(a)(9)(E) (1996).

 AUL, seeking a misimprovement influence factor, was required to submit probative evidence demonstrating that 1) its parcel did not have the same use as surrounding parcels and 2) the inconsis-

---

8. Land orders are administrative rules; therefore, they are subject to the same rules of construction as statutes. *See The Precedent v. State Bd. of Tax Comm'rs,* 659 N.E.2d 701, 704 (Ind. Tax Ct.1995).

9. The Indiana Board's final determination denied AUL's challenge to the land order values for two reasons: 1) taxpayers are unable to challenge values contained in a land order

and 2) assuming *arguendo* that taxpayers can challenge the values in land orders, AUL's evidence failed to demonstrate that the assigned value in the land order was incorrect. (*See* Cert. Admin. R. at 55–68.) However, since the Court finds that the error in valuing AUL's property resulted from the Assessor's misinterpretation of the land order, it need not address the Indiana Board's conclusions.

tent use negatively impacted the subject parcel's value. *See Quality Farm and Fleet*, 747 N.E.2d at 92; *see also* IND. ADMIN. CODE tit. 50, r. 2.2–4–10(a)(9)(E) (1996). To support its claim, AUL asserts that its land "suffers from the 'peculiar attribute' of being underutilized" because its building's footprint occupies only 49% of its parcel's square footage. (Pet'r Br. at 59.) In conjunction with this assertion, AUL submitted a "Land to Building Analysis" demonstrating that six other buildings located in downtown Indianapolis had footprints occupying 80%–99% of their parcel's total square footage. (*See* Cert. Admin. R. at 440.) Such evidence, however, fails to demonstrate that AUL's choice to build its building on a partial portion of its parcel reflects a different "use" from other property owners who chose to occupy their entire parcel space with a building.[10]

Even assuming *arguendo* that AUL's footprint/total square footage ratio constitutes a different "use" than surrounding parcels, AUL failed to quantify how its land suffered a loss in value due to that differing use. Rather, AUL asserted it was entitled to a 25% negative influence factor because an appraisal indicated that its property had a market value of $35 per square foot. (*See* Pet'r Br. at 59. *See also* Cert. Admin. R. at 328–29.) More specifically, AUL claims that if the land order is correctly applied utilizing both base rates (as determined *supra*), the difference between the resulting base rate average of $47.50[11] per square foot and the appraisal's value of $35 per square foot illustrates a difference in value of approximately 25%. (*See* Pet'r Br. at 59.)

■ Influence factors may be quantified through the use of market data. *See Phelps Dodge v. State Bd. of Tax Comm'rs*, 705 N.E.2d 1099, 1106 n. 14 (Ind. Tax Ct.1999), *review denied.*[12] Nevertheless, AUL's appraisal data simply does not demonstrate how the difference in values it proposes resulted specifically from the land being under-improved. *See Fleet Supply, Inc. v. State Bd. of Tax Comm'rs*, 747 N.E.2d 645, 653 (Ind. Tax Ct.2001) (finding that because taxpayer failed to provide evidence linking its land's inconsistent use to an actual loss in value, it was not entitled to a negative influence factor), *review denied.* Thus, the Court agrees with the Indiana Board's finding that AUL "provided no market data to quantify its claim that the alleged deficiencies of the parcel result[ed] in [a] loss of value." (Cert. Admin. R. at 71.) There-

10. Indeed, the Indiana Board concluded as much when it determined that "[AUL] failed to demonstrate that the use of its parcel differs from the use of surrounding properties." (Cert. Admin. R. at 71.) Furthermore, it seems readily apparent to the Court that AUL's land does not suffer from a peculiar attribute inhibiting it from developing the property based on AUL's own evidence: it admits that its building is zoned "CBD–1" explaining, "[t]his zoning allows an owner to build upon and cover the entire parcel with its structure." (Pet'r Br. at 58.) Additionally, AUL admits that the "underutilized space represents an area large enough to support the footprints of four of the above listed comparable high-rise buildings!" (Pet'r Br. at 58.) Thus, had AUL chosen to build a building that would occupy the entire parcel space, it could have done so.

11. AUL added the $20 per square foot base rate and the currently assessed base rate of $75 per square foot to arrive at an average base rate of $47.50. (*See* Pet'r Br. at 59.)

12. "[B]ecause the regulations describing Land Orders and influence factors specifically refer to market concepts ... the use of market concepts in the quantification of influence factors is a permissible means of quantifying influence factors under the True Tax Value system [of property tax assessment used in Indiana]." *Phelps Dodge v. State Bd. of Tax Comm'rs*, 705 N.E.2d 1099, 1106 n. 14 (Ind. Tax Ct.1999), *review denied.*

fore, the Court AFFIRMS the Indiana Board's final determination denying AUL's request for a negative influence factor.

## CONCLUSION

For the reasons stated above, the Court REVERSES and REMANDS the final determination of the Indiana Board with respect to Issues I and II. The Court AFFIRMS the Indiana Board's final determination with respect to Issue III. Upon remand, the Indiana Board is ordered to instruct the local assessing officials to assign AUL's building a grade of "A–2" and to assess AUL's land as prescribed in the land order and consistent with this opinion.