ATTORNEYS FOR PETITIONER:
**MICHAEL N. RED**
MORSE & BICKEL, P.C.
Indianapolis, IN

**PAUL M. JONES, JR.**
PAUL JONES LAW, LLC
Greenwood, IN

ATTORNEYS FOR RESPONDENT:
**CURTIS T. HILL, JR.**
ATTORNEY GENERAL OF INDIANA
**WINSTON LIN**
**ZACHARY D. PRICE**
DEPUTY ATTORNEYS GENERAL
Indianapolis, IN

**JOHN P. BUSHEMI**
**ALFREDO ESTRADA**
BURKE COSTANZA & CARBERRY, LLP
Merrillville, IN

FILED
Oct 28 2019, 11:40 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# INDIANA TAX COURT

| | |
|---|---|
| HEBRON-VISION, LLC, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Cause No. 18T-TA-00019 |
| ) | |
| PORTER COUNTY ASSESSOR, ) | |
| ) | |
| Respondent. ) | |

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**October 28, 2019**

FISHER, Senior Judge

Hebron-Vision, LLC appeals the Indiana Board of Tax Review's final determination that Hebron-Vision failed to establish that it qualified for a charitable purposes exemption for the 2012 through 2015 tax years. Upon review, the Court reverses the Indiana Board's final determination.

# FACTS AND PROCEDURAL HISTORY[1]

On April 19, 2006, Hebron-Vision, a single-member limited liability company, was formed pursuant to the Indiana Business Flexibility Act. (See Cert. Admin. R. at 711-15, 2293-94, 2348.) See also, e.g., IND. CODE § 23-18-2-4(a) (2019) (providing that a person "may form a limited liability company by causing articles of organization to be executed and filed for record with the office of the secretary of state"). Its Articles of Organization require Vision Communities, Inc. ("Vision Communities"),[2] its sole member, to manage the company in accordance with its stated purposes:

> [T]o acquire, own and operate the Misty Glen Apartments in Porter County, Indiana and to perform the following additional activities in connection with the properties:
>
> (a)     To expand opportunities available to disadvantaged residents to obtain adequate affordable housing accommodations by constructing, rehabilitating, operating and providing decent, safe and sanitary housing for said residents who otherwise would not be able to find or afford a suitable place to live;
>
> (b)     To help relieve the poor, distresse[d], underprivileged and indigent by enabling them to secure the basic human needs of decent shelter and to thus lessen the burdens of government and promote the social welfare;
>
> (c)     To provide such housing through rehabilitation of existing substandard buildings and construction of new facilities in the place of blighted structures or blighted adjacent vacant sites for the purpose of combating the deterioration of the community and contributing to its physical improvement; and

---

[1]   Portions of the administrative record in this case have been designated as confidential; consequently, this opinion will only provide the information necessary for the reader to understand its disposition of the issues presented. See generally Ind. Administrative Rule 9.

[2]  Vision Communities is a domestic nonprofit public benefit corporation and a tax-exempt public charity under sections 501(c)(3) and 509(a)(2) of the Internal Revenue Code. (See Cert. Admin. R. at 689-90, 701-06.)   Its Articles of Incorporation provide its purposes are "[t]o develop, construct, own and lease safe, decent, sanitary housing for low- and moderate-income individuals and families; [and t]o make grants to public charities that are exempt from federal income tax[.]" (Cert. Admin. R. at 690.)

(d)     In furtherance of the aforesaid purposes to conduct any and all lawful business and activities for which limited liability companies may be organized under the [Indiana Business Flexibility] Act, provided such business or activity is not inconsistent with the charitable purposes or status of [Hebron-Vision's] sole member, [Vision Communities]."

(Cert. Admin. R. at 711-12, 717.)

To that end, at some point in 2007, Hebron-Vision purchased Misty Glen Apartments ("Misty Glen"), a Section 42[3] 80-unit apartment complex situated on 6.45 acres of land in Porter County, Boone Township, Hebron, Indiana.[4] (See Cert. Admin. R. at 423, 426, 2294, 2651-52.) Although Hebron-Vision did not receive any tax credits when it acquired the property, it continued to operate Misty Glen as a Section 42 apartment complex. (See Cert. Admin. R. at 2307-09, 2327, 2341, 2451-53, 2531-34.) As such, approximately 95% of the residents' annual incomes were at or below 60% of the area median income (adjusted for family size) during the years at issue.[5] (See Cert. Admin. R. at 2531-34, 2997-3001.)

In 2008, Hebron-Vision applied for, and eventually received, a charitable purposes

---

[3]  USC § 42 generally provides that the U.S. Department of Housing and Urban Development ("HUD"), via the Indiana Housing and Community Development Authority ("IHCDA"), may award dollar for dollar tax credits to developers to finance the construction of qualifying housing projects. (See Cert. Admin. R. at 495, 1085-95, 2302-05, 2446-48, 2467-68, 2473-76.) In exchange, the developer agrees to operate its property subject to income and rent restrictions that benefit low-income individuals and families. (See Cert. Admin. R. at 495, 1092-94, 2302-05, 2446-48.)

[4]  Specifically, Misty Glen has 16 one-bedroom units, 40 two-bedroom units, and 24 three-bedroom units. (Cert. Admin. R. at 428.) In addition, the property's amenities include a business center, newly renovated clubhouse, 24-hour fitness center, playground, and a barbeque area with picnic tables and grills. (Cert. Admin. R. at 2960-61.)

[5]  HUD determines and reports area median incomes for metropolitan statistical areas and nonmetropolitan counties. (See, e.g., Cert. Admin. R. at 1031-34, 2506-11.) For example, individuals and families living at 60% of the 2012 area median income for Porter County were established at $27,780 for a single person, $31,740 for a family of two, and $35,700 for a family of three. (Cert. Admin. R. at 502.)

3

exemption for Misty Glen for that year. (See Cert. Admin. R. at 34-58, 2311-12.) In 2010 and 2012, Hebron-Vision submitted a statement to the Porter County Assessor stating that its property should remain exempt because its use of the property had not changed since 2008. (Cert. Admin. R. at 27-28, 32-33.)

On May 30, 2013, the Porter County Property Tax Assessment Board of Appeals (the "PTABOA") determined that the property was ineligible for the exemption in 2012. (Cert. Admin. R. at 6-26.) Consequently, Hebron-Vision filed a petition for review with the Indiana Board on June 21, 2013. (Cert. Admin. R. at 1-73.) Thereafter, Hebron-Vision filed applications for exemption for the 2014 and 2015 tax years,[6] which the PTABOA denied, and Hebron-Vision sought review with the Indiana Board for those years as well. (Cert. Admin. R. at 74-253.) In January 2017, the Indiana Board conducted a consolidated two-day hearing on all of Hebron-Vision's appeals.

During the hearing, Hebron-Vision presented to the Indiana Board nearly forty separate exhibits and the testimony of four witnesses to demonstrate that it owned, occupied, and used its property solely for charitable purposes during the years at issue. (See, e.g., Cert. Admin. R. at v-vi.) More specifically, Hebron-Vision claimed that it qualified for a charitable purposes exemption because all the evidence showed that

1) the government had assumed the burden of providing affordable housing to those who were in need;

2) Hebron-Vision's operation of Misty Glen, via Vision Communities, lessened the government's burden because it provided safe, decent, and sanitary housing at below-market rental rates to people who were in need;

3) the motives of Hebron-Vision and Vision Communities were

---

[6] The Indiana Board explained that Hebron-Vision did not need to file an application for exemption for 2013 because Indiana Code § 6-1.1-11-3.5 would extend the 2012 exemption to 2013. (See Cert. Admin. R. at 2061 n.2.)

4

altruistic because neither received government funding to operate Misty Glen as a Section 42 apartment complex nor improperly profited from the operation of the property; and

4) Hebron-Vision used Misty Glen to satisfy the needs and wants of its residents by promoting a sense of brotherhood for them through its provision of several services[7] that typically were not offered by for-profit/market rate apartment complexes.

(See, e.g., Cert. Admin. R. at 2257-61, 2289, 2292-2302, 2306-08, 2342-43, 2364-65, 2371-73, 2384-87, 2393, 2404-05, 2440-43, 2459, 2509-34, 2794-2828, 2882-85, 2984-07, 3022-23, 3174-77.)  (See also, e.g., Cert. Admin. R. at 419-60 (Rent Analysis), 707-10 (Conflict of Interest and Excess Benefit Policies), 1018-84 (HUD's rental information and median income limit documentation for Porter County).)

In response, the Assessor objected to Hebron-Vision's Rent Analysis and the testimony of its preparer, claiming that the evidence was inadmissible because Hebron-Vision failed to comply with the disclosure requirements of 52 IAC 2-7-1.[8]  (See Cert. Admin. R. at 2770-74.)  The Assessor also presented two exhibits[9] and his own testimony to demonstrate that the totality of the evidence showed

1) Hebron-Vision did not relieve any governmental burden because it received indirect subsidies (e.g., rent or utility assistance) from government and non-governmental sources;

---

[7]  For example, Misty Glen residents had on-site access to free tax preparation services, resumé writing assistance, and blood pressure screenings.  (See Cert. Admin. R. at 512-13, 2984-92.) Hebron-Vision also maintained a list of, and provided referrals to, social services providers for rent, food, or utility assistance.  (See, e.g., Cert. Admin. R. at 516-17, 3053-68.)

[8]  52 IAC 2-7-1 requires litigants to exchange copies of their documentary evidence, witness lists, and exhibit lists within certain prescribed periods.  See 52 IND. ADMIN. CODE 2-7-1(b) (2017).  The rule further provides that a litigant's failure to comply with the disclosure requirements "may serve as grounds to exclude the evidence or testimony at issue."  52 I.A.C. 2-7-1(f).

[9]  The Assessor actually presented a total of six exhibits, but only two of his exhibits addressed Hebron-Vision's eligibility for an exemption.  (See Cert. Admin. R. at vi, 2071 ¶¶ 31-34, 2149-72, 2578-93, 3244-61 (indicating that one exhibit was withdrawn, two exhibits were offered solely to support the Assessor's evidentiary objections, and one exhibit was not admitted into evidence).)

2) Hebron-Vision used its property for a noncharitable profit motive by paying excessive management fees to its offsite property manager, Flaherty & Collins Properties,[10] a for-profit company whose owners helped form Hebron-Vision and Vision Communities;

3) Misty Glen's rental rates were not below-market;

4) Hebron-Vision's policies mirrored those of a typical landlord because it screened prospective tenants based on their ability to pay rent on time, excluding those with poor credit histories and unsatisfactory landlord references; required security deposits; charged late fees; evicted tenants for nonpayment of rent; and did not have a rent forgiveness program;

5) Misty Glen's tenants were not truly in need of charity because the evidence did not show their income levels were any different than those of other area renters; and

6) Hebron-Vision's provision of other services, while noble, actually reflected the charitable acts of those agencies only and was merely incidental to its noncharitable purpose of providing affordable housing to moderate- to low-income individuals and families.

(See, e.g., Cert. Admin. R. at 2272-73, 2344-47, 2615-2633, 2839-73, 3053-90, 3105-18, 3203-42, 3262-69, 3278.)  (See also, e.g., Cert. Admin. R. at 1992 (the Assessor's Market Study), 2026-38 and 2049-55 (the Assessor's post-hearing submissions).)

On May 23, 2018, the Indiana Board issued a final determination, concluding that Hebron-Vision failed to prove that its property was predominately owned, occupied, and used for charitable purposes during the years at issue.  (See Cert. Admin. R. at 2089-90 ¶¶ 93-96.)  Specifically, after overruling the Assessor's objection, the Indiana Board determined that the evidence regarding the a) management fees, b) rental rates, c) residents' income levels and screening process, and d) provision of additional services

---

[10] Flaherty & Collins has been in the business of developing, building, and managing multi-family properties since 1993.  (Cert. Admin. R. at 2269-70.)  It has developed approximately 56 apartment complexes and manages about 15,000 individual apartment units in eight states. (Cert. Admin. R. at 2270-71.)

failed to show that the property qualified for a charitable purposes exemption.  (See Cert. Admin. R. at 2071 ¶ 30, 2086-89 ¶¶ 84-94.)

On July 6, 2018, Hebron-Vision initiated this original tax appeal.  The Court heard oral argument on August 9, 2019.  Additional facts will be supplied as necessary.

## STANDARD OF REVIEW

The party seeking to overturn an Indiana Board final determination bears the burden of demonstrating its invalidity.  Osolo Twp. Assessor v. Elkhart Maple Lane Assocs., 789 N.E.2d 109, 111 (Ind. Tax Ct. 2003).  Accordingly, Hebron-Vision must demonstrate to the Court that the Indiana Board's final determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure required by law; or unsupported by substantial or reliable evidence.  See IND. CODE § 33-26-6-6(e)(1)-(5) (2019).

## LAW

The charitable purposes exemption, set forth in Indiana Code § 6-1.1-10-16, provides that "[a]ll or part of a building is exempt from property taxation if it is owned, occupied, and used . . . for . . . charitable purposes."  IND. CODE § 6-1.1-10-16(a) (2012) (amended 2016).  The exemption also extends to the land on which an exempt building is situated and the personal property that is contained therein.  See I.C. § 6-1.1-10-16(c), (e).  Accordingly, when a taxpayer seeks a charitable purposes exemption, it must demonstrate that it owns, occupies, and predominately uses its property for charitable purposes.  See 6787 Steelworkers Hall, Inc. v. Scott, 933 N.E.2d 591, 595 (Ind. Tax Ct.

7

2010); IND. CODE § 6-1.1-10-36.3(a) (2012) (defining "predominate use").

For purposes of the exemption, the term "charitable purpose" is to be defined and understood in its broadest, constitutional sense. Knox Cty. Prop. Tax Assessment Bd. of Appeals v. Grandview Care, Inc., 826 N.E.2d 177, 182 (Ind. Tax Ct. 2005). "A charitable purpose is established when a taxpayer provides probative evidence to the Indiana Board showing 1) 'relief of human want . . . manifested by obviously charitable acts different from the everyday purposes and activities of man in general[]' and 2) that a benefit sufficient to justify the loss of tax revenue inures to the public through these acts." Starke Cty. Assessor v. Porter-Starke Servs., Inc., 88 N.E.3d 814, 817 (Ind. Tax Ct. 2017) (citations omitted).

**ANALYSIS**

On appeal, Hebron-Vision claims that the Indiana Board's final determination must be reversed for three reasons. First, it claims that the Indiana Board failed to consider its main legal argument that the federal and state governments had assumed the burden of providing affordable housing to certain individuals. (See Pet'r Br. at 45-46; Oral Arg. Tr. at 4-5.) Second, Hebron-Vision claims that the Indiana Board's findings regarding the a) management fees, b) rental rates, c) residents' income levels and screening process, and d) additional services are not supported by substantial evidence. (See Pet'r Br. at 22-45.) Finally, Hebron-Vision maintains that the Indiana Board erred in concluding that it did not establish it qualified for a charitable purposes exemption during the years at issue because the totality of the evidence established that its ownership, occupancy, and use of Misty Glen lessened a governmental burden. (See, e.g., Pet'r Br. at 45-48; Oral Arg. Tr. at 5-10.)

## I. The Government's Burden

During the Indiana Board hearing, Hebron-Vision argued, in both its opening and closing statements, that both the federal government and the State of Indiana had assumed the burden of providing affordable housing to certain individuals and families. (See Cert. Admin. R. at 2257-61 (citing IND. CODE § 5-20-1-1 (2012)), 3281-88.) (See also Cert. Admin. R. at 2014-21 (Hebron-Vision's post-hearing submissions (citing, e.g., IND. CODE § 5-20-4-5 (2012)).) The statutory provisions upon which Hebron-Vision relied declare

> that there exists in the state of Indiana a need for safe and sanitary residential housing within the financial means of low and moderate income persons and families, a need which unmet is a threat to the health, safety, morals and welfare of Indiana residents and which will require an excessive expenditure of public funds for the social problems thus created;
>
> * * * * *
>
> [and] that the provision of decent, safe and sanitary housing for persons and families of low and moderate income who would otherwise be unable to obtain adequate housing at costs they could afford is a valid public purpose for which public money may be spent[.]

I.C. § 5-20-1-1(1), (3). The Indiana Supreme Court has explained that the purpose of these provisions, to provide suitable housing for Indiana's low and middle income residents, is public in nature and a valid exercise of the legislative police power because the benefits received by private individuals are incidental to the execution of a legitimate public purpose. Steup v. Indiana Hous. Fin. Auth., 402 N.E.2d 1215, 1220-22 (Ind. 1980). The Supreme Court observed:

> "'It requires little evidence and less imagination to realize the effect upon communities and the state generally when housing is inadequate and substandard. The lack of adequate housing

9

> underlies many of the problems suffered by a state. . . . All citizens are then called upon to bear the cost of combating the evils which are inevitable in the absence of good, adequate, clean, and financially possible housing. Nothing could be more of a public purpose.'"

Id. at 1221 (citation omitted).

To effectuate the purposes of these statutes, the General Assembly created the Indiana Housing and Community Development Authority ("IHCDA") (f/k/a/ the Indiana Housing Finance Authority), "'which is an instrumentality or agency of the state although it is not the state in its sovereign corporate capacity.'" See id. at 1218 (citation omitted). See also IND. CODE § 5-20-1-3(a) (2012); P.L. 235-2005, § 217 (eff. May 15, 2005). The IHCDA's mission is "[t]o provide housing opportunities, promote self-sufficiency, and strengthen communities" by, for example, "[c]reat[ing] and preserv[ing] housing for Indiana's most vulnerable population[ and e]nhanc[ing] self-sufficiency initiatives in existing programs." (Cert. Admin. R. at 988.) To that end, the IHCDA allocates state and federal funds to private organizations to facilitate the development of low-income housing for certain individuals and families. See, e.g., IND. CODE §§ 5-20-1-4, -4-1 et seq. (2012); I.C. § 5-20-4-5 (defining "lower income families" as "families whose income does not exceed eighty percent (80%) of the median income for the area"). (See also Cert. Admin. R. at 495, 1085-95, 2302-05, 2446-48, 2467-68, 2473-76.)

The Assessor did not challenge Hebron-Vision's theory; instead, he claimed that Hebron-Vision did not alleviate any government burden because it received subsidies from various governmental sources. (See, e.g., Cert. Admin. R. at 2261-64, 3290-97.) (See also Cert. Admin. R. at 2020-40, 2049-57 (the Assessor's post-hearing submission).) The Indiana Board's final determination only recites the parties' arguments

10

on this issue.  (See Cert. Admin. R. at 2076 ¶ 50, 2086 ¶ 84, 2084-89 ¶¶ 80-92.)  Thus, to the extent it does not contain any specific findings regarding the validity of Hebron-Vision's legal argument, it is erroneous.  See infra Part III.

This Court has previously explained that the Indiana Board may not simply refuse to consider probative evidence but must deal with it in some meaningful manner.  Clark v. State Bd. of Tax Comm'rs, 694 N.E.2d 1230, 1235 (Ind. Tax Ct. 1998).  Similarly, the Indiana Board must address the validity of a party's legal argument, not simply ignore it.  Here, the statutory provisions on which Hebron-Vision relied and related record evidence, (see, e.g., Cert. Admin. R. at 2531-34, 2997-3001), established that the federal government as well as the State of Indiana assumed the burden of providing affordable housing to certain individuals and families during the years at issue.

## II. Substantial Evidence

Hebron-Vision also claims that the Indiana Board's findings regarding the a) management fees, b) rental rates, c) residents' income levels and screening process, and d) additional services are not supported by substantial evidence, arbitrary, capricious, and not in accordance with the law.  (See Pet'r Br. at 22-45; Pet'r Reply Br. 10-27.)  The Assessor maintains, however, that those findings are proper because they are supported by substantial evidence, and thus, are not arbitrary, capricious, or inconsistent with the law.  (See Resp't Br. at 21-39.)

When reviewing an Indiana Board final determination, the Court will accept the Indiana Board's findings of fact so long as they are supported by substantial evidence.  Cedar Lake Conference Ass'n v. Lake Cty. Prop. Tax Assessment Bd. of Appeals, 887 N.E.2d 205, 207 (Ind. Tax Ct. 2008), review denied.  In evaluating whether substantial

11

evidence exists, the Court will not reweigh the record evidence or judge the credibility of the witnesses who testified at the Indiana Board's hearing. See Freudenberg-NOK Gen. P'ship v. State Bd. of Tax Comm'rs, 715 N.E.2d 1026, 1030 (Ind. Tax Ct. 1999), review denied. The Court will find that substantial evidence exists when evidence is more than a scintilla, that is, evidence that reasonable minds might accept as adequate to support the Indiana Board's conclusion. See Porter-Starke Servs., 88 N.E.3d at 820.

## A. Management Fees

In its final determination, the Indiana Board explained that the evidence regarding the management fees indicated that Hebron-Vision did not own, occupy, or use Misty Glen for charitable purposes. (See Cert. Admin. R. at 2088 ¶ 89.) Specifically, the Indiana Board stated it was

> concerned about the founders of [Hebron-Vision/Vision Communities] profiting from Misty Glen by using their for-profit company[, Flaherty & Collins,] to manage the property. A fee of 6% of gross rent plus the salary of an employee, is not insignificant. Using [a witness's] 10% capitalization rate, that equates to a $710,000 boon to Flaherty & Collins. This is contrary to the requirement that property be owned, occupied, and used for a charitable purpose.

(Cert. Admin. R. at 2088 ¶ 89.) (See also Cert. Admin. R. at 2661-65 (regarding the 10% capitalization rate).) The Assessor contends that this finding is supported by substantial evidence because 1) Hebron-Vision/Vision Communities and Flaherty & Collins have common ownership, 2) Hebron-Vision's "own uncontroverted evidence" demonstrates that the purpose of Flaherty & Collins is to make money for its owners and investors, and 3) a "'boon' can be defined as a 'bonus, benefit or financial gain[.]'" (See Resp't Br. at 22-23; Oral Arg. Tr at 39-43.)

At the outset, the Assessor asserts that "it is not disputed that [Hebron-

Vision/Vision Communities] and Flaherty & Collins have common ownership." (Resp't Br. 22 (citing Cert. Admin. R. at 2272-73).) The evidence, however, does not support his assertion because it indicates that Hebron-Vision is wholly owned by Vision Communities and that Vision Communities is an Indiana nonprofit corporation formed under the Indiana Nonprofit Corporation Act of 1991. (See Cert. Admin. R. at 690, 711, 716-18, 728.) Consequently, Vision Communities does not have private owners, but is instead owned by itself. See, e.g., Yogi Bear Membership Corp. v. Stalnaker, 571 N.E.2d 331, 333-34 (Ind. Ct. App. 1991) (holding that because a nonprofit corporation is a legal entity separate and distinct from its members, it must be represented by legal counsel in judicial proceedings).

Moreover, in finding as it did, the Indiana Board added Flaherty & Collins' offsite property management fee and the onsite property manager's annual salary (as did the Assessor), applied a 10% capitalization rate to the result, and then attributed the entire amount to Flaherty & Collins. (See Cert. Admin. R. at 754-55, 2088 ¶ 89, 2616-19.) The Indiana Board erred in doing so for two reasons. First, the Indiana Board's finding that Flaherty & Collins received a management fee of $710,000 is not supported by substantial evidence. Indeed, during the Indiana Board hearing, Hebron-Vision's witnesses testified that apartment complexes employ offsite and onsite property managers because they perform different jobs. (See Cert. Admin. R. at 2909-14, 2397-99.) While offsite property managers typically receive anywhere from 2.5 to 7 percent of a property's gross rents depending on its size, onsite property managers receive set salaries. (See Cert. Admin. R. at 2619-20, 2882-83, 2911.) For instance, Misty Glen's offsite property manager, Flaherty & Collins, received 6% of the gross rents for collecting rental payments; paying

13

the bills; providing accounting services; and hiring, overseeing the training of, and supervising certain staff.  (See Cert. Admin. R. at 793,  834, 879, 927, 2910-11, 2934, 2938-41.)  Misty Glen's onsite property manager, however, received an annual salary of over $30,000 for handling the day-to-day operations of the complex and the distinct needs of the tenants.  (See Cert. Admin. R. at 794, 835, 880, 928, 2625-26, 2911-12.)  The witnesses further explained that although the onsite property manager was an employee of Flaherty & Collins, in order to provide her with better healthcare benefits, Hebron-Vision ultimately paid her salary by reimbursing Flaherty & Collins.  (See Cert. Admin. R. at 2624-26, 2883-85.)

In addition, the witnesses testified that Flaherty & Collins, who served as the offsite property manager before Hebron-Vision even purchased the property, did not receive any of the tax credits from the original owner/developer.  (See Cert. Admin. R. at 2346, 2453.) Indeed, during the years at issue Flaherty & Collins merely broke even or lost money in managing Misty Glen because the management fee did not cover its overhead.  (See Cert. Admin. R. at 2289-92, 2396-97, 2402, 2406-08.)  In addition, there was no evidence that the owners of Flaherty & Collins, who also served on the Board of Directors for Vision Communities, had disclosed any conflict of interest or received any excess benefits due to its operation of Misty Glen.  (See Cert. Admin. R. at 707-10, 2408-10, 2364-65, 2372-73, 2384-87, 2393, 2405 (defining an "excess benefit" as "a benefit or payment provided that exceeds the value of services that were provided in return").)  Moreover, there is no indication that the services for which the offsite and onsite property managers were compensated were not actually performed.  Collectively, this unrebutted evidence demonstrates that 1) the offsite property management fee and the onsite property

14

manager's salary are legitimate business expenses; 2) the offsite and onsite management expenses are not excessive; and 3) neither Flaherty & Collins nor its owners profited from the operation of Misty Glen during the years issue.

Second, neither party could explain why the Indiana Board capitalized the aggregated offsite property management fee and onsite property manager's salary. (See, e.g., Oral Arg. Tr. at 11-12, 39.) To the extent the Indiana Board sought to apply the income approach, a method for valuing real estate, its methodology was flawed. See 2011 REAL PROPERTY ASSESSMENT MANUAL (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011)) at 2 (providing that the income approach, which is "used for income producing properties that are typically rented[,] converts an estimate of income, or rent, [a] property is expected to produce into value through a mathematical process known as capitalization"). Indeed, in this context, the capitalization of Hebron-Vision's expenses has no basis. As stated above, the capitalization of net income is used to arrive at the value of property using the income approach, such is not the case here. See, e.g., Madison Cty. Assessor v. Sedd Realty Co., 125 N.E.3d 676, 678-79 (Ind. Tax Ct. 2019) (illustrating the application of the income approach). Consequently, the Indiana Board's methodology failed to produce a reliable estimate of value and thus lacks probative value. See Tipton Cty. Health Care Found., Inc. v. Tipton Cty. Assessor, 961 N.E.2d 1048, 1051 n.3 (Ind. Tax Ct. 2012) (providing that "'[p]robative evidence is evidence that tends to prove or disprove a point in issue'") (citation omitted).

The Indiana Board's final determination does not explain its basis for disregarding the uncontroverted record evidence regarding the offsite property manager's fee and the onsite property manager's salary or for capitalizing the aggregated earnings of the offsite

15

and onsite property managers. Consequently, its finding that Hebron-Vision used Misty Glen for its own profit rather than charitable purposes is not only unsupported by substantial evidence, but also arbitrary and capricious. See, e.g., Sedd Realty, 125 N.E.3d at 681 (providing that an Indiana Board final determination is "'arbitrary and capricious when there is no basis in the record that would lead a reasonable person to the same conclusion'") (citation omitted).

## B. Rental Rates

The Indiana Board also determined that the evidence concerning Misty Glen's rental rates did not establish that its rental rates were below-market during the years at issue, explaining that

> [a]lthough [Hebron-Vision] claims to offer its tenants "affordable" apartments, affordability does not equate to charitable. [Hebron-Vision] presented conflicting evidence making it difficult for the Board to definitively conclude that the rents charged at Misty Glen are in fact "below market." In fact, according to . . . [one of Hebron-Vision's witnesses], Misty Glen['s] rents are actually higher than The Pines, a nearby Section 515 property.
>
> [Hebron-Vision] presented a [R]ent [A]nalysis prepared by . . . a certified general appraiser. According to [the Appraiser], in 2012 Misty Glen rented one bedroom apartments "at the lower end of the range" of adjusted market rents on a per square foot basis. For two bedrooms, [the Appraiser] determined that Misty Glen rented "below average" of the adjusted market rents on a per square foot basis. And finally, for three bedrooms, [the Appraiser] concluded Misty Glen rented "at the low end of the range" of adjusted market rents on a per square foot basis. [The Appraiser] deduced that in 2012, Misty Glen['s] rents were "below market." [The Appraiser] went on to state that, based on her "continued research," Misty Glen['s] rents for 2013, 2014, and 2015 were "more likely than not" also below market. The Board will not accept [the Appraiser's] conclusory statement that based on her "continued research" 2013, 2014, and 2015 rents were "more likely than not" also below market. As a result, [the Appraiser] has failed to convince the Board that Misty Glen charged below market rents in 2013, 2014, and 2015. With that being said, even if the Board accepts that the 2012 rents were at the "low end" of the

16

range of rents charged by purportedly comparable properties, having a rent below the average does not make an apartment complex "charitable."

(Cert. Admin. R. at 2088-89 ¶¶ 90-91.) The Assessor contends that these findings are proper because Hebron-Vision presented "conflicting evidence" by showing that The Pines, another rent-restricted property, had lower rental rates than Misty Glen. (See Resp't Br. at 26-27.) The Assessor also maintains that his Market Rent Study shows that Misty Glen's rental rates were higher than the average market rental rates for the area. (See Resp't Br. at 24-26.) Moreover, the Assessor claims that Hebron-Vision's Rent Analysis and the related testimony lack probative value because the Rent Analysis conclusions are derived from an incomparable market, and the testimony regarding the rental rates for 2013 through 2015 was "mere speculation" because the Appraiser did not conduct a rent analysis for those years.[11] (See Resp't Br. at 23-24; Oral Arg. Tr. at 30-31.) The Assessor's arguments are unpersuasive for several reasons.

First, and most importantly, Hebron-Vision presented Porter County fair market rent ("FMR") information developed by HUD for the years at issue. (See Cert. Admin. R. at 989-99, 1018-30, 1035-48, 1053-65, 1069-81.) This evidence indicates that HUD uses the FMRs to establish standard rental amounts for its rental assistance programs, including setting the rent ceiling for the HOME/Section 42 program. (See Cert. Admin. R. at 990, 2761 (providing that the HOME and Section 42 programs are one in the same).)

---

[11] The Assessor asks the Court to disregard Hebron-Vision's Rent Analysis and the related testimony, claiming that the Indiana Board erred in overruling his objection. (See Resp't Br. at 27; Oral Arg. Tr. at 43-45.) The Court, however, need not address this issue because its determination that Misty Glen's rental rates are below market is not based on the Rent Analysis. Moreover, even if the Court addressed the issue, it would uphold the Indiana Board's ruling because the Assessor failed to develop a sufficient argument on appeal. See, e.g., Scopelite v. Indiana Dep't of Local Gov't Fin., 939 N.E.2d 1138, 1145 (Ind. Tax Ct. 2010) (indicating that the Court will not resolve an issue when its proponent fails to provide sufficient legal analysis).

The evidence further provides that HUD's FMRs

> are gross rent estimates[ that] include the shelter rent plus the cost of all tenant-paid utilities, except telephones, cable or satellite television service, and internet service. HUD sets FMRs to assure that a sufficient supply of rental housing is available to program participants[, and therefore,] FMRs must be both high enough to permit a selection of units and neighborhoods and low enough to serve as many low-income families as possible. The level at which FMRs are set is expressed as a percentile point within the rent distribution of standard-quality rental housing units. The current definition is the 40th percentile rent, <u>the dollar amount below which 40 percent of the standard-quality rental housing units are rented.</u> The 40th percentile of rent is drawn from the distribution of rents of all units occupied by recent movers (renter households who moved to their present residence within the past 15 months). HUD is required to ensure that FMRs exclude non-market rental housing in their computation. Therefore, HUD excludes all units falling below a specified rent level determined from public housing units in HUD's program databases as likely to be either assisted housing or other otherwise at a below-market rent, and units less than two years old.

(Cert. Admin. R. at 990 (footnotes omitted and emphasis added).) (<u>See</u> <u>also</u> Cert. Admin. R. at 990 (providing "[s]tandard-quality rental housing units have the following attributes: Occupied rental units paying cash rent; Specified renter on 10 acres or less; With full plumbing; With full kitchen; Unit more than 2 years old, and Meals not included in the rent").) This evidence demonstrates the federal standard used to determine a low-income individual or family eligible for assistance, and thus, that HUD's FMRs for Porter County are below-market because 60% of the rental rates within that market are in excess of HUD's FMR rates.

Second, when that evidence is considered in light of the other unrebutted evidence, it shows that during the years at issue Misty Glen's average rental rates for one bedroom units ranged from about $30 to $100 less than HUD's FMRs for Porter County, its average rental rates for two bedroom units were about $90 to $160 lower than those

18

of HUD, and its average rental rates for three bedroom units were anywhere from $200 to $240 less than HUD's.  (See Cert. Admin. R. at 1705.)  (Compare also Cert. Admin. R. at 799-802, 842-45, 887-90, 935-38 (Misty Glen's Rent Rolls) with Cert. Admin. R. at 1018, 1035, 1053, 1069 (HUD's FMR data for Porter County).)  Furthermore, contrary to the Assessor's claim, and perhaps the Indiana Board's finding,[12] the fact that The Pines' rental rates were lower than those of Misty Glen does not mean Hebron-Vision's evidence conflicted.  (See Cert. Admin. R. at 1768.)  Rather, it shows that its evidence is consistent because the rental rates at both properties are lower than HUD's FMRs for Porter County, and thus, below market.  (See Cert. Admin. R. at 2956, 2975, 3182 (indicating that The Pines' rental rates are lower than those of Misty Glen because the annual incomes of its residents, unlike those of Misty Glen's residents, must be at or below 30% of the area median income).)

Third, the Assessor's Market Rent Study does not rebut Hebron-Vision's evidence that Misty Glen's rental rates were below market because it lacks probative value.  See Tipton Cty. Health Care Found., 961 N.E.2d at 1051 n.3 (providing that probative evidence tends to prove or disprove a point in issue).  More specifically, during the Indiana Board hearing, the Assessor explained that the rental rates set forth in his Market Rent Study were based on a total of seven different properties located in Hebron (Porter County) and Lowell (Lake County).  (See Cert. Admin. R. at 1992, 3203-28.)  The Assessor, however, failed to establish that those seven properties were truly comparable to Misty Glen or that his rental rate conclusions were reliable because:  1) the Market Rent Study contains scant information regarding the amenities of the seven properties;

---

[12]  The Indiana Board did not identify which parts of Hebron-Vision's evidentiary presentation conflicted.  (See Cert. Admin. R. at 2088 ¶ 90.)

19

2) there is no description of how the amenities of the seven properties were similar to or different from those of Misty Glen; 3) there is no explanation of how the differences between the seven properties and Misty Glen affected the rental rate conclusions; 4) there is no indication whether the Hebron properties are rent-restricted; 5) no adjustments were made for location although three of the properties were located in another county; and 6) no adjustments were made for age even though all seven of the properties were built 10 to 44 years before Misty Glen. (See Cert. Admin. R. at 1992, 3203-28, 3228-29, 3271-74; see also Cert. Admin. R. at 2308-09, 2801, 2845-46, 2851, 2853-56, 2942-43 (providing that apartment complexes in Hebron are all rent-restricted).) See also, e.g., Long v. Wayne Twp. Assessor, 821 N.E.2d 466, 470-71 (Ind. Tax Ct. 2005) (providing that to establish comparability, litigants must explain the subject property's characteristics, how those characteristics compared to those of the other properties, and how any differences in any of their characteristics affected their values), review denied.

Fourth, the Indiana Board's findings that the Rent Analysis properties are "purportedly comparable" to Misty Glen is not only arbitrary and capricious, but also unsupported by substantial evidence. More specifically, because the Indiana Board's final determination does not reveal why it questioned the comparability of the Rent Analysis properties to Misty Glen, its finding on that subject is arbitrary and capricious. To the extent the Indiana Board's finding is premised on the Assessor's claim that the Valparaiso and Hebron markets are not comparable, the final determination does not explain why the Rent Analysis, which contains adjustments for location, failed to account for any differences between the two markets. (See Cert. Admin. R. at 2803-07, 2878-79.) Furthermore, the final determination disregards that the Rent Analysis rental rate

20

conclusions are not based exclusively on Valparaiso properties. Indeed, the Rent Analysis and related testimony establish that the average market rents in Portage, Crown Point, and Merrillville, as reported in the Tikijian and Associates 2012 Indiana Apartment Survey (the "Tikijian Survey"), were considered in developing the final Rent Analysis rental rate conclusions. (See Cert. Admin. R. at 455-56, 2816-17.) Accordingly, the Indiana Board's finding that the Rent Analysis properties were "purportedly comparable" is arbitrary and capricious and unsupported by substantial evidence. See, e.g., Sedd Realty, 125 N.E.3d at 680-81 (explaining that the Indiana Board's failure to explain its rationale for reaching a conclusion that is not supported by substantial evidence is arbitrary and capricious).

Lastly, the Indiana Board's finding that the Appraiser's testimony regarding Misty Glen's rental rates for 2013 through 2015 was conclusory is also arbitrary and capricious and unsupported by substantial evidence. Specifically, the record reveals that during the Indiana Board hearing, the Appraiser reviewed a few pages from the Tikijian Survey and then explained that the extent of the rental rate increases in Portage, Crown Point, and Merrillville for 2013 through 2015 indicated that Misty Glen's rental rates remained below market during those years. (See Cert. Admin. R. at 2821-26.) Therefore, the Appraiser's testimony contains her rationale and is not conclusory. See, e.g., BLACK'S LAW DICTIONARY 362 (11th ed. 2019) (defining "conclusory" as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based"). Consequently, the Indiana Board erred in concluding that the evidence failed to establish that Misty Glen's rental rates were below market.

21

## C. Residents' Income Levels and Screening Process

In concluding that Hebron-Vision failed to show it used Misty Glen for charitable purposes, the Indiana Board also found that

> the predominate and primary use of the subject property is providing apartment living to its tenants. [Hebron-Vision] characterized its tenants as "disadvantaged" because their income levels fall within certain income limits established by IHCDA. However, [Hebron-Vision] failed to show the income levels of its tenants differ from the income levels of residents at other conventional apartments.
>
> Similar to the [p]etitioner in Jamestown Homes, [Hebron-Vision] retains several "typical" landlord rights: tenants can be evicted if they failed to pay their rent, charges can be applied for late rent payments, an initial "application screening" is conducted to determine if tenants had adequate credit, and tenants must prove they have had no prior evictions. . . . Admittedly, [Hebron-Vision] has "often" denied potential tenants during the initial screening. Consequently, [Hebron-Vision] evicted four tenants during the years in question for nonpayment of rent. Clearly[, Hebron-Vision] is using shrewd business skills in selecting tenants. <u>But this also indicates that [Hebron-Vision] is not selecting tenants who are in most need of charitable housing or who have difficulties finding housing due to prior evictions or bad credit</u>.

(Cert. Admin. R. at 2087 ¶¶ 86-87 (citation omitted and emphasis added).) The Assessor contends that these Indiana Board findings are supported by substantial evidence because they are based entirely on Hebron-Vision's Resident Selection Criteria Policy and the related testimony. (See Resp't Br. at 34-36.) Indeed, the Assessor claims this finding is proper because the evidence "indicates that [Hebron-Vision] did not rent to tenants avoided by landlords in general and tenants who are in need of true charity." (Resp't Br. at 39.)

Although the Indiana Board's finding is based on Hebron-Vision's evidence, it cannot stand because it: 1) is derived from the faulty legal premise that the subjects of charity must be the neediest; and 2) fails to take into account the statutes and evidence

22

that show that Misty Glen's residents are in need. With respect to the first point, there is no legal requirement that a taxpayer's disposition of charity be confined to a particular subset of individuals. See, e.g., Raintree Friends Hous., Inc. v. Indiana Dep't of State Revenue, 667 N.E.2d 810, 814 (Ind. Tax Ct. 1996) (providing that an organization that "limits the dispensation of its blessings to one sex, or to the inhabitants of a particular city or district, or to the membership of a particular religious or secular organization, does not . . . deprive it either in legal or popular apprehension of the character of a charitable institution" (quoting City of Indianapolis v. Grand Master, etc., of Grand Lodge of Indiana, 25 Ind. 518, 522 (1865))).

With respect to the second point, the Legislature has determined that individuals and families whose income does not exceed 80% of the area median income ("AMI") are in need of safe, sanitary, and affordable housing. See I.C. §§ 5-20-1-1(1), (3), -4-5. Thus, those individuals and families are proper subjects of charity. The evidence in this case shows that the policies and procedures implemented by Hebron-Vision during the years at issue ensured that the annual incomes of nearly all of Misty Glen's actual residents were at or below 60% of the AMI. (See, e.g., Cert. Admin. R. at 2997-3001.) In addition, the evidence indicates that during the 2014 tax year, 21% of Porter County households were ALICE[13] Households (i.e., households with incomes above the federal poverty level, but below the basic cost of living), 10% of Porter County households were Poverty Households, and 36% of Hebron's households were ALICE and Poverty Households. (See Cert. Admin. R. at 1410, 1584-85.)

---

[13] "ALICE is an acronym that stands for **A**sset **L**imited, **I**ncome **C**onstrained, **E**mployed, comprising households with income above the Federal Poverty Level but below the basic cost of living." (Cert. Admin. R. at 1410.)

Furthermore, the evidence shows that in 2014, the AMI for a Porter County family of four ranged from $60,903 to $63,800. (See Cert. Admin. R. at 1066, 1584.) Based on those figures, the AMI of a Porter County family of four surviving on an AMI of 60% would have ranged from $36,540 to $38,280.[14] In turn, the Household Survival Budget (i.e., the bare minimum needed to survive) for a Porter County family of four was $53,400.[15] (Cert. Admin. R. at 1584.) Thus, a Porter County family of four living on 60% of AMI in 2014 made about $16,000 less than what was considered to be the bare minimum needed to survive. Moreover, the evidence indisputably shows that an undisclosed number of Misty Glen's residents[16] still required additional financial assistance to make ends meet despite the fact that their rental rates were below HUD's FMRs. (See, e.g., Cert. Admin. R. at 2344-46.) When the evidence is considered in light of the relevant statutory provisions, it indicates that Misty Glen's residents were proper subjects of charity. The Indiana Board's final determination does not explain the basis for discounting either the statutes or the evidence on this issue. Accordingly, this finding cannot stand because it is not in accordance with the law, is not supported by substantial evidence, and is arbitrary and capricious.

### D. Additional Services

The Indiana Board's final determination also provides that Hebron-Vision

---

[14] The calculations are as follows: ($60,903 * 0.6 = $36,541.80) and ($63,800 * 0.6 = $38,280).

[15] The "Household Survival Budget" "calculates the actual costs of basic necessities (housing, [childcare], food, health care, and transportation) in Indiana, adjusted for different counties and household types." (Cert. Admin. R. at 1410.)

[16] The Assessor contends that the evidence shows that 22 of Misty Glen's residents received Section 8 rental vouchers. (See Resp't Br. at 31-32 (citing Cert. Admin. R. at 2344).) (See also, e.g., Cert. Admin. R. at 2026.) The certified administrative record, however, contains no evidence to that effect. (See generally Cert. Admin. R.)

introduced evidence in an attempt to prove it provides "an element of fraternity and brotherhood." According to [one of the witnesses], Misty Glen offers various services to its tenants that "typically (are) not provided at for-profit entities." Those services include neighborhood watch meetings, self-defense training, fitness and nutrition training, scam education, various social events, resumé writing and job search assistance, free blood pressure tests, and help with tax preparation. Admittedly, several of these services are provided to the tenants from several outside government and private sector agencies and are not actually provided by [Misty Glen/Hebron-Vision]. While these services may be admirable, the Board finds these activities fail to prove the predominate use of the property is for charitable purposes. Additionally, these services are not the type of activities that relieve human want or provide a benefit that will inure to the general public sufficient to justify the loss of tax revenue.

(Cert. Admin. R. at 2087-88 ¶ 88 (citations omitted).) The Assessor claims that this finding is proper because Hebron-Vision's evidence indicates that a "'substantial amount' of [the] social services provided for Misty Glen tenants were provided not by Misty Glen, but were instead provided by outside agencies, and the social services provided by outside agencies to Misty Glen tenants were 'acts of charity' provided by outside agencies, not 'acts of charity' provided by Misty Glen [] or Hebron-Vision[.]" (Resp't Br. at 29 (citations omitted).) The Court is not persuaded.

It is well-established that the qualification for an exemption under Indiana Code § 6-1.1-10-16 does not require a unity of ownership, occupancy, and use. See, e.g., Grandview Care, 826 N.E.2d at 183. Indeed, "'[if] one seeks to reward charities for their activities and to encourage beneficial public service, drafting a statute that severely limits the ability of a charity to organize and operate in an efficient and cost-effective manner would be illogical.'" Id. (quoting Sangralea Boys Fund, Inc. v. State Bd. of Tax Comm'rs, 686 N.E.2d 954, 958 (Ind. Tax Ct. 1997), review denied). Thus, when a unity of ownership, occupancy, or use is lacking, as here, the Court must "'ensure that the

particular arrangement is not driven by a profit motive.'" Id. (citation omitted). Moreover, this Court has observed that a landlord's attempt to provide an "'element of fraternity, brotherhood, or good fellowship intended to improve the spirits or impel to renewed effort,' whether it be through, for example, free services for, or counseling of, its tenants" could indicate that the landlord's property is being used for charitable purposes. See Jamestown Homes of Mishawaka, Inc. v. St. Joseph Cty. Assessor, 909 N.E.2d 1138, 1144 (Ind. Tax Ct. 2009).

As previously mentioned, there is no evidence that Hebron-Vision, Vision Communities, Flaherty & Collins, or the owners of Flaherty & Collins improperly profited from Misty Glen's operations. Rather, the evidence indicates that when Misty Glen's revenues exceeded its expenses, the revenues belonged to Vision Communities and were either reinvested into Misty Glen or used to further other charitable purposes. (See Cert. Admin. R. at 2404-05, 2440-43.) The evidence also shows that even though Misty Glen's revenues exceeded its expenses in 2012 and 2015 only, Hebron-Vision has not been able to repay Vision Communities the balance of a $70,000 loan for Misty Glen's operations. (See Cert. Admin. R. at 791-98, 832-39, 877-84, 925-32, 2441-43, 2629-33.)

Furthermore, the evidence shows that Hebron-Vision provided Misty Glen's residents with access to free tax preparation services and blood pressure screenings; monthly meetings on topics that included self-defense, senior scams, and nutrition; on-site community book and video libraries; holiday/special event parties and contests; and referral information for rent, food, utility, and transportation assistance. (See Cert. Admin. R. at 512-17, 2984-86, 2993-3002, 3052-68, 3081-82.) Additionally, the residents had access to a business center where they received help with their resumés, completing

26

online applications, and performing online research for jobs. (See Cert. Admin. R. at 2986-99.) The evidence also shows that Hebron-Vision worked with its tenants to keep evictions at a minimum, as evidenced by the fact that only six tenants were evicted over the four year period at issue.[17] (See Cert. Admin. R. at 3007-13.) Accordingly, based on the totality of the evidence, the Indiana Board erred in concluding that Hebron-Vision's provision of additional services, whether directly or indirectly, "are not the type of activities that relieve human want or provide a benefit that will inure to the general public sufficient to justify the loss of tax revenue." (See Cert. Admin. R. at 2087-88 ¶ 88.)

### III. Whether Hebron-Vision lessened a governmental burden

Hebron-Vision has also claimed that the Indiana Board's final determination must be reversed because the unrebutted, probative evidence established that it qualified for a charitable purposes exemption by showing that its ownership, occupancy, and use of Misty Glen lessened a governmental burden. (See, e.g., Pet'r Br. at 45-46.) The Assessor, on the other hand, claims that because the evidence failed to show Hebron-Vision "'relieved the government of its obligations,'" Hebron-Vision did not show it qualified for an exemption. (See Resp't Br. at 31 (citing Jamestown Homes, 909 N.E.2d at 1142).)

The Assessor explains that Hebron-Vision did not relieve the government of its financial obligations because Hebron-Vision, either directly or indirectly via Vision Communities and Misty Glen's tenants, received grants, cash contributions, and rent/utility subsidies from government sources. (See Resp't Br. at 31-34 (citing, e.g., Cert. Admin. R. at 805, 823, 854, 899, 956); Oral Arg. Tr. at 28-29.) The Assessor therefore

---

[17] Two of the tenants were evicted for failing to comply with recertification, drug, or crime policies and the other four tenants were evicted for failing to pay rent. (See Cert. Admin. R. at 3007-13.)

concludes that the evidence "show[s] that the government is carrying the financial burden of Misty Glen['s] tenants, and in some cases 'relieving the rent burden' of the tenants, not that [Hebron-Vision] or Vision Communities relieved the government of its obligations." (Resp't Br. at 33-34.) The Court is not persuaded, however, for two reasons.

First, contrary to the Assessor's claim, the record evidence does not show that Hebron-Vision, by virtue of its relationship to Vision Communities, received state/local government grants and cash contributions. To support his claim, the Assessor cites portions of Vision Communities' federal tax returns for the years at issue. (See Cert. Admin. R. at 805-31, 846-76, 891-924, 940-87.) The returns report the aggregated incomes, expenses, and assets of Misty Glen along with at least three other Indiana affordable housing complexes. (See Cert. Admin. R. at 826-27, 870-71, 920, 924, 973-75.) (See also Cert. Admin. R. at 2568-69, 2697-98, 2746-47.) The returns do not, however, "state what money or profit Vision Communities [] put back into [] Misty Glen[.]" (See Cert. Admin. R. at 2707-08.) The returns also do not indicate the purposes for which Vision Communities received the purported government grants and cash contributions. (See, e.g., Cert. Admin. R. at 2704-09.) Consequently, Vision Communities' tax returns do not show that Hebron-Vision actually received grants and cash contributions from government sources during the years at issue.

Second, and just as importantly, this Court has explained that

> when a private organization uses its property to perform charitable acts that relieve the government of its obligations, an exemption is proper: "when a private organization takes on a task that would otherwise fall to the government, this provides a benefit to the community as whole because it allows the government to direct its funds and attention to other community needs."

Jamestown Homes, 909 N.E.2d at 1141 (quoting College Corner, L.P. v. Dep't of Local

28

Gov't Fin., 840 N.E.2d 905, 910 (Ind. Tax Ct. 2006)). A taxpayer does not, however, need to demonstrate that it relieves a governmental obligation completely to qualify for a charitable purposes exemption. See, e.g., Grandview Care, 826 N.E.2d at 184 (providing that "Indiana courts have recognized that 'charitable' is not necessarily the equivalent of 'free'"). Indeed, "[e]ven when a taxpayer receives government funds, it 'fulfill[s] a charitable purpose to the extent that it lessened some part of the government's burden.'" Porter-Starke Servs., 88 N.E.3d at 819 (citations omitted). Consequently, to qualify for a charitable purposes exemption "a taxpayer must provide actual evidence that a government burden exists and that this burden is relieved beyond the extent of the grants." Id. at 820 (citation omitted).

The evidence in this case shows that the federal government and the State of Indiana have taken on the burden of providing affordable housing to individuals and families whose annual incomes do not exceed 80% of the AMI. Although federal tax credits were allocated to a private organization to facilitate the development of Misty Glen, the evidence indisputably shows that Hebron-Vision, Vision Communities, and Flaherty & Collins did not receive any of those tax credits. The evidence also shows that Hebron-Vision voluntarily charges its tenants, (i.e., individuals/families with annual incomes at or below 60% of the AMI), below market rental rates and keeps evictions to a minimum. (See, e.g., Cert. Admin. R. at 2531-34.) Hebron-Vision also provides its tenants with access to, and facilitates the provision of, a variety of social services and activities. In addition, there is absolutely no evidence that Hebron-Vision uses Misty Glen to generate

profits for Flaherty & Collins or any other private organization/individual.[18]  Given the totality of the record evidence, therefore, the Indiana Board erred when it concluded that Hebron-Vision failed to establish that it owned, occupied, and used its property for charitable purposes, and thus, qualified for a charitable purposes exemption during the years at issue.

## CONCLUSION

For the above-stated reasons, the Court REVERSES the final determination of the Indiana Board.

---

[18]  The Assessor has claimed that Hebron-Vision is not entitled to a charitable purposes exemption because the evidence indicates that Vision Communities and Hebron-Vision "donated only meager amounts to charities and zero to Hebron community charities." (See Resp't Br. at 37-38.) This claim is unavailing because Hebron-Vision has not claimed that it qualified for a charitable purposes exemption because it makes charitable contributions to other organizations. (See generally Pet'r Br.)